IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRANSPERFECT GLOBAL, INC, et al., | Case No.: C-10-02590 CW (JCS) |
| Plaintiffs/Counterclaim defendants, | **ORDER GRANTING TRANSPERFECT'S MOTION FOR DISQUALIFICATION OF COUNSEL** |
| v. | |
| MOTIONPOINT CORPORATION, | |
| Defendant/Counterclaim plaintiff. | |

## I.    INRODUCTION

This action arises out of a patent infringement dispute between TransPerfect Global, Inc, TransPerfect Translations International, Inc., Translations.com, Inc. ("Plaintiffs" or "TransPerfect"), and MotionPoint Corporation ("Defendant" or "MotionPoint").  TransPerfect brings the present Motion for Disqualification of Counsel ("Motion") on the basis that MotionPoint's counsel, McDermott Will & Emery LLP ("McDermott"), currently represents TransPerfect and its owners, Phil Shawe and Elizabeth Elting.  A hearing was held on Monday, June 18, 2012 at 12:30 p.m.  For the reasons stated below, the Court GRANTS the Motion.

## II.     BACKGROUND

### A.     Factual Background

On June 6, 2010, TransPerfect filed this action against MotionPoint seeking a declaratory judgment of non-infringement and invalidity of four patents. *See* Dkt. No. 1. MotionPoint counterclaimed on July 30, 2010. *See* Dkt. No. 10. McDermott represents MotionPoint in this suit and has been MotionPoint's prosecution counsel since at least May 9, 2006. *See* Declaration of Joseph H. Lee in Support of TransPerfect's Motion ("Lee Decl."), ¶ 7.

Phil Shawe and Elizabeth Elting are the Co-CEOs and co-owners of TransPerfect, a closely-held, language translation firm that employs more than 2,000 persons in approximately 85 offices worldwide. Declaration of Phil Shawe in Support of TransPerfect's Motion ("Shawe Decl."), ¶¶ 1, 3; Declaration of Elizabeth Elting in Support of TransPerfect's Motion ("Elting Decl."), ¶¶ 1, 3.[1] Prior to April 2011, Shawe and Elting were represented by Carlyn S. McCaffrey, then a partner at Weil, Gotshal & Manges LLP ("Weil"), in connection with estate planning services. Shawe Decl. ¶ 6; Elting Decl. ¶ 6; Declaration of Carlyn S. McCaffrey in Support of MotionPoint's Opposition ("McCaffrey Decl."), ¶ 2. While at Weil, McCaffrey's services to Shawe and Elting included drafting a will, a revocable trust, and a buy-sell agreement, also known as "TransPerfect Shareholder's Agreement." McCaffrey Decl. ¶¶ 2, 17. The buy-sell agreement provided limitations on transferability of Shawe's and Elting's shares in TransPerfect, including allowing Shawe and Elting to buy out the other's shares upon the other's death. *Id.*

In April 2011, McCaffrey left Weil to join McDermott. *Id.* Shortly before her move, Shawe contacted McCaffrey to prepare a prenuptial agreement on his behalf. *Id.* at ¶ 4. McCaffrey states that she informed Shawe that she was leaving Weil and joining McDermott, but that she could perform the requested services for him at McDermott. *Id.* Shawe agreed. *Id.* Additionally, in April 2011, McCaffrey sent file transfer forms to both Shawe and Elting, seeking their consent to continue her representation of them at McDermott and to transfer their files from Weil to McDermott. *Id.* at ¶

---

[1] Additionally, Shawe and Elting oversee the day-to-day business operations of the company, are the company's only two board members, the final decision-makers with respect to any significant corporate decisions, and own a combined 99% of TransPerfect. Shawe Decl. ¶ 4; Elting Decl. ¶ 4. TransPerfect is structured as an S-corporation, meaning that, *inter alia*, Shawe and Elting pay individual income taxes on all of TransPerfect's profits, which, likes its losses, pass through to

United States District Court
Northern District of California

5.  Shawe and Elting signed and returned the forms, although Shawe has no memory of ever having received or signed the form.  *Id.* at Exs. B & D; Shawe Decl. ¶¶ 12-13.  McDermott also conducted a conflicts check on Shawe and Elting in April 2011.  *Id.* at ¶ 9.  That screening process did not show a conflict.  *Id.*

After joining McDermott, McCaffrey had engagement letters sent to Shawe and Elting by U.S. mail on April 13, 2011 and April 25, 2011, respectively.  The letters read in part:

> In order to avoid misunderstandings concerning potential conflicts of interest, it is our policy to clarify the identity of our clients and the circumstances under which we may represent other clients with interests which are or may be adverse to yours.  We understand that our representation of you extends only to you, individually, at this time.

> In addition, we are accepting this engagement with your consent that we may accept any other engagement from an existing or new client, even if the matter requires that we take a position that is or might be directly adverse to you or to one of your affiliates, provided that the engagement is not substantially related to the subject matter of any services we have provided to you and will not require disclosure of any of your confidential information. This advance waiver of conflicts includes litigation matters in which we may represent a client who is adverse to you or another member of your family in matters not related to our engagement.

*Id.* at Ex. E.  Neither Shawe nor Elting signed and returned the engagement letters.  Shawe Decl. ¶ 10; Elting Decl. ¶ 10.  And neither Shawe nor Elting has any recollection or record of ever receiving an engagement letter from McDermott.  *Id.*

Between May 2011 and January 2012, McDermott provided estate planning services to Shawe related to the preparation of prenuptial and postnuptial agreements.  McCaffrey Decl. ¶ 11. During this time, McCaffrey interacted primarily with Shawe's financial consultant, Michael Stone.[2] *Id.*  Stone sent McCaffrey TransPerfect's tax returns in case they were needed "for full disclosure" in the prenuptial agreement.  *Id.* ¶¶ 11, 15; Declaration of Michael Stone in Support of TransPerfect's Motion ("Stone Decl."), ¶ 6.  McCaffrey's services were billed to Shawe at the address McDermott

---

[2] McCaffrey states that during her representation of Shawe and Elting, she has exchanged approximately fifteen emails with Shawe, indicating that Shawe e-mailed her at her McDermott address: cmccaffrey@mwe.com.  *Id.* ¶ 20.  She does not recall having spoken, or exchanging any e-mails, with Elting since joining McDermott.  *Id.*

had on file for him: Mr. Philip Shawe, TransPerfect, Three Park Avenue, New York, NY 10016. *Id.* ¶ 12 & Ex. G. Each invoice included a cover letter to Shawe on McDermott letterhead. *Id.* Around January 2012, Stone advised McDermott that Shawe and Elting wished to have McDermott provide further services with respect to the draft buy-sell shareholder agreement that McCaffrey drafted while at Weil. *Id.* ¶ 13. McDermott billed Shawe and Elting for the work done on the draft agreement in February 2012. *Id.* ¶ 17 & Ex. K. All of Shawe's and Elting's legal bills were paid by TransPerfect and approved by Stone as the company's external certified public accountant. Stone Decl. ¶ 7.

On May 14, 2012, eleven months after McCaffrey left Weil to join McDermott, Shawe states that he first learned of the conflict at issue in this Motion. Shawe Decl. ¶ 8. That is, Shawe already knew McDermott represented MotionPoint in this litigation but did not know that McDermott also represented him in his estate matters. *See id*; Stone Decl. Ex. B (Stone-Shawe May 14 Email Exchange); Declaration of Joel M. Freed in Support of MotionPoint's Opposition ("Freed Decl."), Ex. B (November 8, 2010 email from Shawe to MotionPoint acknowledging McDermott's representation of MotionPoint in this matter). Shawe believed McCaffrey was still employed at Weil. *See id.* Stone alerted Shawe to this information after Stone received a document reflecting McDermott's representation of MotionPoint, a fact Stone was unaware of until that point. Stone Decl. ¶¶ 8-9. Elting did not know of the conflict until Shawe relayed the information to her on May 14, 2012. Elting Decl. ¶ 8. Until that time, Elting, who states she has had little to no involvement in this action, was unaware of McDermott's representation of MotionPoint. *Id.* ¶ 12.

On May 30, 2012, TransPerfect filed the present Motion to disqualify McDermott.

## B.     The Motion

In the Motion, TransPerfect contends that McDermott should be disqualified because its representation of MotionPoint is adverse to its concurrent representation of TransPerfect, Shawe, and Elting. Motion at 12-13 (citing Rule 3-310(C)(3) of the California Rules of Professional Conduct). Although TransPerfect asserts that Shawe, Elting, and it are all McDermott clients, it contends that disqualification is appropriate if any *one* of them is a client. *Id.* at 13-14.

4

United States District Court
Northern District of California

1   Additionally, TransPerfect argues that neither Shawe, Elting, nor it were ever provided

2   informed written consent to the conflict as required by California law to avoid a breach of the duty

3   of loyalty.  *Id.* at 15 (citing *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 819-20 (N.D. Cal.

4   2004)).  The only relevant document purportedly signed by Shawe and Elting was the file transfer

5   form, which cannot be considered a waiver because "it made no mention of any conflicts generally

6   or, much less, of the specific conflicts that exist in this case, or their consequences."  *Id.* at 16.

7   Regarding the engagement letters sent from McDermott to Shawe and Elting, TransPerfect argues

8   that these letters are insufficient to establish informed written consent for two reasons.  *Id.*  First,

9   Shawe and Elting, who have no recollection or record of having received such letters, never signed

10  the letters.  *Id.* (citing Rule 3-310(A)(2) & (C)).  Second, the letters fail to meet the disclosure

11  requirements of Rule 3-310(A)(1) because they contain boilerplate waiver language, "which fails to

12  identify or explain the details of the specific conflicts in this case . . . ."  *Id.* (citing *Concat*, 350 F.

13  Supp. 2d at 819-21).

14  TransPerfect further contends that disqualification is appropriate even if McDermott never

15  represented TransPerfect because McDermott's representation of MotionPoint is adverse to its

16  representation of Shawe and Elting as the co-owners of TransPerfect.  *Id.* at 17 (citing *Concat*, 350

17  F. Supp. 2d at 818-19).  The services provided by McDermott to Shawe and Elting, TransPerfect

18  contends, were not merely of a private nature, and were "inextricably intertwined with the business

19  and financial matters of the TransPerfect."  *Id.* at 18.  For example, the "TransPerfect Shareholders'

20  Agreement" is intended to provide for the company's long-term survival and ongoing operations in

21  the event that Shawe or Elting, who own a combined 99% of the company, were to die.  *Id.*

22  TransPerfect also argues that the fact that its corporate structure and finances are inextricably linked

23  to Shawe and Elting, demonstrates that McDermott's representation of Shawe and Elting extends to

24  TransPerfect.  *Id.* at 19 (citing, *inter alia*, *Decaview Distrib. Co. v. Decaview Asia Corp.*, 2000 U.S.

25  Dist. LEXIS 16534, at *40 (N.D. Cal. Aug. 10, 2000)).  TransPerfect goes on to assert that

26  McDermott in fact believed it was representing TransPerfect.  *Id.* at 19-20.

27  Finally, TransPerfect argues that delay is not a proper basis on which to deny the Motion

28  since TransPerfect, Shawe, and Elting only became aware of the conflict on May 14, 2012 and

objected to McDermott's representation of MotionPoint the next day.  *Id.* at 20-21.  Moreover, delay is not a proper factor in a disqualification motion based on a *concurrent* conflict.  *Id.* at 20 (citing *Blue Water Sunset, LLC v. Markowitz*, 192 Cal. App. 4th 477, 490 (2011)).

In response, MotionPoint argues that the Motion is largely based on the mistaken premise that TransPerfect is McDermott's client.  MotionPoint's Opposition to TransPerfect's Motion ("Opposition"), 8.  MotionPoint asserts that an attorney for an individual shareholder does not necessarily represent the corporation.  *Id.* (citing *Koo v. Rubio's Rests., Inc.*, 109 Cal. App. 4th 719, 732-733 (2003); *Mengle v. Goldsmith*, 2011 WL 1058852, at *6 (M.D. Fla. Mar. 21, 2011); *Waggoner v. Snow, Becker, Kroll, Klaris & Kraus*, 991 F.2d 1501, 1509 (9th Cir. 1993)).  Additionally, MotionPoint contends that the record does not support an implied-in-fact attorney-client relationship between McDermott and TransPerfect.  *Id.* at 9.  For example, the buy-sell agreement did not include TransPerfect as a signatory or party and governed only Shawe's and Elting's personal assets.  *Id.*  Regarding Shawe's tax returns, MotionPoint insists that McDermott never reviewed the returns because they were unnecessary for the prenuptial agreement McCaffrey was preparing for Shawe.  *Id.* at 9-10.  MotionPoint argues further that TransPerfect's payment of Shawe's and Elting's legal bills does not create an attorney-client relationship.  *Id.* at 10.

MotionPoint next contends that because TransPerfect is not a McDermott client, it lacks standing to bring the Motion.  *Id.* at 11 (citing *Kasza v. Browner*, 133 F.3d 1159, 1171 (9th Cir. 1998); *Colyer v. Smith*, 50 F. Supp. 2d 966, 969 (C.D. Cal. 1999)).  Standing is not present because McDermott never received the kind of confidential information from TransPerfect that could impact TransPerfect's interest in a just and lawful determination of its claims.  *Id.* (citing *Concat*, 350 F. Supp. 2d at 819-20; *Colyer*, 50 F. Supp. 2d at 971).

Even if TransPerfect has standing, MotionPoint argues, Shawe and Elting waived conflicts of interest under New York and California law.  *Id.* at 12.  As a preliminary matter, MotionPoint insists New York law should apply to this Motion since McCaffrey is a New York lawyer, Shaw and Elting are New York residents, and the correspondences at issue all occurred in New York.  *Id.*  MotionPoint contends that Shawe and Elting waived any conflict of interest under New York law— which requires "informed consent, confirmed in writing"—upon receiving the engagement letter.  *Id.*

United States District Court
Northern District of California

6

at 12-13 (citing Rule 1.7(b)(4) of the New York Rules of Professional Conduct).  It does not matter that Shawe and Elting never signed the letter because they were advised of the conflict waiver in writing and "have acted in all respects in accordance with [its] terms."  *Id.* at 13.  MotionPoint further argues that Shawe and Elting are sophisticated executives with full knowledge of the waiver in the engagement letter and with full knowledge that McDermott represented MotionPoint.  *Id.*  The waiver also passes muster under California law because they confirmed in numerous emails, through their agent Stone, their intent to work with McDermott even after receiving the engagement letter and while being aware that McDermott also represented MotionPoint.  *Id.* at 14 (citing *In re Marriage of Friedman*, 100 Cal. App. 4th 65, 71 (2002)).

MotionPoint further contends that, notwithstanding a valid waiver, McDermott has not breached its duty of loyalty because Shawe and Elting are the later-acquired client and therefore it would "turn the duty of loyalty on its head" to preclude McDermott from continuing to represent MotionPoint in this case.  *Id.* at 15 (quoting *Friskit, Inc. v. RealNetworks, Inc.*, 2007 WL 1994204, at *2 (N.D. Cal. Jul. 5, 2007)).  Even if McDermott did breach its duty, TransPerfect's delay in bringing this Motion precludes disqualification.  *Id.* at 16-17 (citing *Liberty Nat. Enters., L.P. v. Chicago Title Ins. Co.*, 194 Cal. App. 4th 839, 844 (2011); *Openwave Sys. Inc. v. Myriad France S.A.S.*, 2011 WL 1225978, at *6 (N.D. Cal. Mar. 31, 2011)).  MotionPoint contends that Shawe and Elting, whose knowledge is imputed to TransPerfect, knew of this purported conflict for nearly one year.  *Id.* at 17.  The Motion should be denied because the substantial delay reveals that it is being brought on the eve of the close of discovery in order to gain a tactical advantage in the litigation.  *Id.*

In its reply, TransPerfect rejects MotionPoint's contention that the duty of loyalty is not violated here because Shawe and Elting are the later-acquired clients.  TransPerfect's Reply in Support of the Motion ("Reply"), 2.  Rather, TransPerfect contends that MotionPoint's authority for its argument has not been followed by the Court.  *Id.* (citing *Fujitsu Ltd. v. Belkin Int'l Inc.*, 2010 U.S. Dist. LEXIS 138407, at *19-20 (N.D. Cal. Dec. 22, 2010)).

III.   **ANALYSIS**

    A.   **Legal Standard**

        1.   **Disqualification Generally**

Federal courts in California look to state law to decide motions to disqualify. *Openwave Sys. Inc. v. Myriad France S.A.S.*, 2011 WL 1225978, at *1 (N.D. Cal., Mar. 31, 2011) (citing *In re County of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000)).  Pursuant to Rule 11-4 of the Civil Local Rules of the Northern District of California, attorneys practicing in this district are required to adhere to "the standards of professional conduct required of members of the State Bar of California," which are contained in "the State Bar Act, the Rules of Professional Conduct of the State Bar of California and decisions of any court."  Civ. L.R. 11–4 and comment; *see also Visa U.S.A., Inc. v. First Data Corp.*, 241 F. Supp. 2d 1100, 1103 (N.D. Cal. 2003).

Under California law, "the propriety of disqualification depends on the circumstances of the particular case in light of competing interests." *The Oaks Mgmt. Corp. v. Super. Ct.*, 145 Cal. App. 4th 453, 464-65 (2006) (citing *William H. Raley Co. v. Sup. Ct.*, 149 Cal. App. 3d 1042, 1048 (1983)). "The court must weigh the combined effects of a party's right to counsel of choice, an attorney's interest in representing a client, the financial burden on a client of replacing disqualified counsel and any tactical abuse underlying a disqualification proceeding against the fundamental principle that the fair resolution of disputes within our adversary system requires vigorous representation of parties by independent counsel unencumbered by conflicts of interest." *Raley*, 149 Cal. App. 3d at 1048. However, "[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar." *People v. SpeeDee Oil Change Systems, Inc.*, 20 Cal. 4th 1135, 1145 (1999).  Thus, "[t]he important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process." *Id.*

The decision to disqualify counsel is within the discretion of the trial court as an exercise of its inherent powers. *Visa*, 241 F. Supp. 2d at 1103 (citing *United States v. Wunsch*, 84 F.3d 1110, 1114 (9th Cir. 1996); *Image Technical Serv., Inc. v. Eastman Kodak Co.*, 820 F. Supp. 1212, 1215 (N.D. Cal. 1993); and Cal. Code Civ. Proc. § 128(a)(5)).  Because motions to disqualify are often

United States District Court
Northern District of California

1    tactically motivated, they are strongly disfavored and are subjected to "particularly strict judicial

2    scrutiny." *Optyl Eyewear Fashion Intern. Corp. v. Style Companies, Ltd.*, 760 F.2d 1045, 1050 (9th

3    Cir. 1985) (citation omitted).

4                      **2.**      **Concurrent Representation**

5         The issue presented by the Motion is governed by Rule 3-310 of the California Rules of

6    Professional Conduct, which states in relevant part:

7       (C) A member shall not, without the informed written consent of each client: (1) Accept
        representation of more than one client in a matter in which the interests of the clients

8       potentially conflict; or (2) Accept or continue representation of more than one client in a
        matter in which the interests of the clients actually conflict; or (3) Represent a client in a

9       matter and at the same time in a separate matter accept as a client a person or entity whose
        interest in the first matter is adverse to the client in the first matter.

10

11       . . .

12       (E) A member shall not, without the informed written consent of the client or former client,
        accept employment adverse to the client or former client where, by reason of the

13       representation of the client or former client, the member has obtained confidential
        information material to the employment.

14

15    Cal. Rules of Prof'l Conduct 3-310.

16         Rule 3-310 forbids lawyers in California from simultaneously representing two clients that

17    are adverse to each other, even where the adversity arises in two unrelated matters, unless the lawyer

18    fully discloses the conflict and obtains a waiver in writing. *Flatt v. Super. Ct.*, 9 Cal. 4th 275, 284-

19    86 (1994) (holding that "[e]ven though the simultaneous representations may have *nothing* in

20    common, and there is *no* risk that confidences to which counsel is a party in the one case have any

21    relation to the other matter, disqualification may nevertheless be *required*") (emphasis in original).

22    The reason for the prohibition is the attorney's "duty to maintain undivided loyalty to their clients to

23    avoid undermining public confidence in the legal profession and the judicial process." *SpeeDee Oil*,

24    20 Cal. 4th at 1146 (citations omitted); *cf. Certain Underwriters at Lloyd's, London v. Argonaut Ins.*

25    *Co.,* 264 F. Supp. 2d 914, 922 (N.D. Cal. 2003) (Chen, J.); *Forrest v. Baeza*, 58 Cal. App. 4th 65, 67

26    (1997) (holding that "[t]he strict proscription against dual representation of clients with adverse

27    interests . . . derives from a concern with protecting the integrity of the attorney-client relationship

28    rather than from concerns with the risk of specific acts of disloyalty or diminution of the quality of

United States District Court
Northern District of California

the attorney's representation"). "The effective functioning of the fiduciary relationship between attorney and client depends on the client's trust and confidence in counsel." *Id.* (citation omitted). "The courts will protect clients' legitimate expectations of loyalty to preserve this essential basis for trust and security in the attorney-client relationship." *Id.* at 1147 (citation omitted).

### B.   Whether TransPerfect has Standing to Bring a Motion to Disqualify

MotionPoint asserts that TransPerfect lacks standing to bring this Motion because it is not, and has never been, a McDermott client. TransPerfect argues that it has standing because it is a McDermott client, and, even if it is not a client, its corporate structure and finances are inextricably linked to Shawe and Elting, whom MotionPoint concedes are McDermott clients. The Court finds that TransPerfect has standing because McDermott represents the company's co-owners and CEOs, and its representation of them is inextricably linked to TransPerfect.

The parties agree that, "as a general rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification." *Kasza v. Browner*, 133 F.3d 1159, 1171 (9th Cir. 1998) (quoting *In re Yarn Processing Patent Validity Litig.*, 530 F.2d 83, 88 (5th Cir. 1976)). The parties further agree that an exception to this general rule is "where the ethical breach so infects the litigation in which disqualification is sought that it impacts the moving party's interest in a just and lawful determination of her claims." *Colyer v. Smith*, 50 F. Supp. 2d 966, 969 (C.D. Cal. 1999). "Courts have invoked the exception in *Colyer* where particular facts have established that the party seeking disqualification had a personal stake beyond the general interest in the fair administration of justice." *S.E.C. v. King Chuen Tang*, 2011 WL 5914028, at *12 (N.D. Cal. Nov. 28, 2011) (Spero, J.); *see, e.g.*, *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 818 (N.D. Cal. 2004) (Illston, J.) (holding that non-client had standing where alleged conflict arose out of concurrent representation and third party had formerly had an ownership interest in the company that was seeking qualification); *Decaview Dist. Co., Inc. v. Decaview Asia Corp.*, 2000 WL 1175583, at *4 (N.D. Cal. Aug. 14, 2000) (James, J.) (holding that non-client could bring a motion to disqualify where moving party's confidential information was in the possession of opposing counsel as a result of a prior representation by opposing counsel); *Dimenco v. Service Employees Intern. Union*, 2011 WL 89999 (N.D. Cal. Jan. 10, 2011) (Armstrong, J.) (holding that in

action brought by union members under the Labor Management Relations Act, union had standing to bring motion to disqualify based on alleged conflict arising out of representation of union members by firm that concurrently represented an entity adverse to the union in a separate action because, under the LMRDA, union members assert claims in a representative capacity on behalf of the union).

MotionPoint argues that the exception in *Colyer* does not apply here because "very few files" were sent to McDermott relating to its representation of Shawe and Elting, and what materials were sent "related solely" to the estate planning work performed for them.  Opposition at 11-12.  MotionPoint also suggests that standing was found in *Concat* only because the non-party had provided a large volume of confidential information regarding his company's intellectual property and finances to the lawyers whom he sought to disqualify.  *Id.* at 12.  MotionPoint, however, misreads *Concat*'s holding.

In *Concat*, the non-client company, Concat, sought to disqualify Morgan, Lewis & Bockius LLP ("Morgan Lewis") based on its current representation of Dr. H.S. Winchell for his estate planning needs.  *See Concat*, 350 F. Supp. 2d at 800-03.  The Court found that the Winchell's ownership and management interest in Concat—a 24% limited partnership interest, the majority stockholder, and the company's managing partner—satisfied the requirements of *Colyer* and the company was granted standing.  *Id.* at 818-819.  Moreover, although defendants argued that standing was not satisfied because non-party Winchell did not disclose any confidential information to Morgan Lewis, the Court rejected the argument, stating that "the prohibition against concurrent adverse representation is based on the duty of loyalty, not confidentiality."  *Id.* at 819.  Thus, under the "much stricter standard applying to conflicts arising from concurrent representation," it was enough that Winchell's disclosures to Morgan Lewis "were not merely of a private nature, since they were inextricably intertwined with the business and financial matters of [Concat]."  *Id.*[3]

---

[3] At the hearing on this Motion, MotionPoint argued that *Concat*'s conclusion that the two representations were "inextricably intertwined" was based on the *litigation* interests at issue. MotionPoint insists that this interpretation of *Concat* is consistent with a California State Bar Opinion delineating when a lawyer may represent a parent company and its subsidiary in matters that may pose a conflict of interest.  *See* 1989 WL 253261, at *3 ("The attorney's duty of loyalty, however, extends only to adverse consequences on existing clients which are 'direct.'").

United States District Court
Northern District of California

11

1    Because the issue in this case is concurrent representation—and not successive

2  representation, which involves the attorney's duty of confidentiality, *see Morrison Knudsen Corp. v.*

3  *Hancock, Rothert & Bunshoft*, 69 Cal. App. 4th 223, 230 (1999)—the parties' dispute over whether

4  confidential information was turned over to McDermott in its representation of Shawe and Elting is

5  not dispositive.  Rather, in determining whether TransPerfect has a sufficient personal stake in the

6  Motion, the Court here, as in *Concat*, looks to the relationship between TransPerfect and Shawe and

7  Elting, as well as the nature of McDermott's representation of Shawe and Elting.  MotionPoint does

8  not dispute any of the facts showing Shawe's and Elting's significant ownership and management

9  interest in TransPerfect: Shawe and Elting own 49% and 50% of TransPerfect, respectively;

10  TransPerfect is a closely held S corporation, meaning its net income and losses are passed through to

11  Shawe and Elting, who also personally guarantee various corporate liabilities of the company;

12  Shawe and Elting are co-CEOs and the company's only two board members.  Additionally, as in

13  *Concat*, Shawe's and Elting's estate planning services provided by McDermott were not simply

14  personal in nature, but "were inextricably intertwined with the business and financial matters" of

15  TransPerfect.  *Concat*, 350 F. Supp. 2d at 819.  Given Shawe's substantial ownership interest in the

16

17  MotionPoint asserts that Winchell's disclosure of the confidential intellectual property information
in the course of his estate planning matters was "directly" in conflict with the patent litigation

18  involving his company, and therefore the company could claim an injury from the dual
representation.  The Court, however, declines to impute this holding to the *Concat* Court's order.

19  That Winchell provided intellectual property information to his estate planner does not appear

20  sufficient to render the subject matter of that representation "inextricably intertwined" with the
subject matter of the patent litigation.

21         Moreover, MotionPoint's proposed rule is different from their cited State Bar Opinion, which

22  speaks to whether the *consequences* to the existing client is direct, not whether the subject matters of
the two representations are directly in conflict.  MotionPoint's proposed rule is more like the

23  substantial relationship test used to determine whether the duty of confidentiality bars a lawyer from
opposing a former client in a "substantially related" matter.  *See Flatt*, 9 Cal. 4th at 284.  Finally,

24  even if the Court were to apply the "direct consequences" test, the Court notes that Shawe's and
Elting's financial connection with, and personal control over, TransPerfect would constitute

25  sufficiently "direct consequences" arising from McDermott's representation of MotionPoint.  *See*

26  *Certain Underwriters*, 264 F. Supp. 2d at 922-24 (citing the State Bar Opinion and concluding that
the parent and subsidiary should be treated as one entity for conflict purposes because of (1) the

27  "relatively direct financial relationship" between the two companies, including the direct sharing of
profits and losses, and (2) "the common management" of the companies, "including supervision over

28  the legal affairs of both entities").

United States District Court
Northern District of California

company, the drafting of his prenuptial and postnuptial agreements was a potentially vital process in ensuring the company's survival.[4]  Additionally, the buy-sell agreement, also referred to as "TransPerfect Shareholders' Agreement," allows the possibility of continuity of ownership in the company upon the death of Shawe or Elting.

TransPerfect's stake in this Motion is sufficient because McDermott's representation of TransPerfect's controlling owners was "inextricably intertwined" with the business of the company. *See Concat*, 350 F. Supp. 2d at 818-19; *Colyer*, 50 F. Supp. 2d at 971.  Accordingly, the Court concludes that TransPerfect has standing to bring the Motion challenging McDermott's concurrent representation of Shawe/Elting and of MotionPoint.[5]

### C.    Whether Shawe and Elting Waived the Conflict

"[I]n all but a few instances, the rule of disqualification in simultaneous representation cases is a per se or 'automatic' one." *Flatt*, 9 Cal. 4th at 284; *see also SpeeDee Oil*, 20 Cal. 4th at 1147. "When evaluating whether a law firm may concurrently represent two clients, even on unrelated matters, it is presumed that the duty of loyalty has been breached and counsel is automatically disqualified." *Visa U.S.A., Inc. v. First Data Corp.*, 241 F. Supp. 2d 1100, 1104 (N.D. Cal. 2003)

---

[4] Although the Court's ruling does not rely on the disclosure of confidential information, the Court notes that MotionPoint does not dispute that Shawe's financial consultant and TransPerect's external CPA, Stone, disclosed to McDermott TransPerfect's confidential corporate tax returns in case they were needed in drafting Shawe's agreements.  *See Concat*, 350 F. Supp. 2d at 802 (plaintiff alleged that he sent attorney "detailed information concerning the business structure, finances and assets of Concat").  MotionPoint argues that McCaffrey did not need the tax returns and never looked at them, and, in any event, that TransPerfect's tax returns are not the kind of confidential information that would allow TransPerfect standing.  However, the Court is unconvinced that whether McCaffrey even looked at the tax returns has any bearing on protecting client confidentially, especially considering that in conflict cases, an attorney's access to a past client's confidential information is presumed.  *See Morrison*, 69 Cal. App. 4th at 238.  Additionally, the Court cannot conclude that TransPerfect has no interest in protecting its financial information in this litigation.

[5] Because the Court finds that TransPerfect has standing under the exception identified in *Colyer*, the Court need not decide whether TransPerfect is a McDermott client.  However, the Court notes that TransPerfect has not alleged any explicit agreement between it and McDermott that would establish an attorney-client relationship.  Additionally, the Court declines to find an implied contract creating an attorney-client relationship, which would require determining whether the parties intended to form such a relationship.  *See Responsible Citizens v. Super. Ct.*, 16 Cal. App. 4th 1717, 1732-33 (1993).

(Hamilton, J.).  The presumption may be rebutted and a law firm may nonetheless simultaneously represent two adverse clients if full disclosure of the situation is made to both clients and both agree in writing to waive the conflict.  *Id.* at 1104.[6]

The parties agree that there is no document that explicitly discloses the conflict at issue here and that is signed by Shawe and Elting.  Rather, MotionPoint argues that its initial engagement letter adequately reveals the conflict and that Shawe's and Elting's conduct throughout its relationship with McDermott has been "in accordance with the terms of the engagement letters."  Opposition at 13.  Besides the engagement letter, MotionPoint does not contend that there were any disclosures by McDermott of the conflict.  Even assuming that the engagement letter, which does not specifically mention MotionPoint or this litigation, adequately informs Shawe and Elting of the concurrent representation at issue, MotionPoint's insistence that Shawe's and Elting's written consent is not necessary for a waiver is directly contrary to the law.  Additionally, to the extent MotionPoint argues that Shawe's and Elting's signatures on the file transfer letters *before* they apparently received the engagement letters satisfy the written consent requirement, that argument is rejected as illogical.  The Court declines MotionPoint's invitation to parse the actions and subjective beliefs of Shawe and Elting in determining whether they "consented" to the conflict.  The requirement of informed written consent is clear and excusing the need to confirm consent in writing would undermine the rule's purpose and rationale.[7]

---

[6] MotionPoint argues that this Motion should be decided under New York law and suggests that the standard for waiver is different under New York law than under California law.  The Court need not decide whether New York or California law applies to the waiver issue because it finds the result is the same regardless of what law is applied.  As MotionPoint states, New York law requires that each client "give informed consent, confirmed in writing."  Rule 1.7(b)(4) of the N.Y. Rules of Professional Conduct; *see DeAngelis v. Am. Airlines, Inc.*, 2010 WL 1270005, at *3 n.2 (E.D.N.Y. Mar. 26, 2010).  This requirement appears identical to California's.  MotionPoint provides no authority, and the Court finds none, supporting MotionPoint's suggestion that New York law materially differs on this point.

[7] The Court notes that while MotionPoint spends much time trying to create consent from Shawe's and Elting's supposed knowledge of the conflict, the Court is unaware if McDermott ever knew of the conflict until notified by TransPerfect's counsel in May 2012.  According to MotionPoint, McDermott ran a conflicts check when Shawe and Elting became its clients in April 2011, but nothing came up.  Thus it appears that McDermott was not aware of the conflict when the engagement letters were sent out that same month.  Arguably, a thorough conflicts check would have revealed that McDermott was currently adverse to a company in which its new clients held a 99%

**D.    Whether McDermott Should be Disqualified From Representing its First Client, MotionPoint, for Breaching the Duty of Loyalty Owed to its Later-Acquired Clients, Shawe and Elting**

Relying on *Friskit, Inc. v. RealNetworks, Inc.*, 2007 WL 1994204 (N.D. Cal. Jul. 5, 2007) (Schwarzer, J.), MotionPoint argues that because Shawe and Elting became McDermott clients after MotionPoint became a client, it would "turn the duty of loyalty on its head" to preclude McDermott from continuing to represent MotionPoint in this case. *Id.* at *2 ("[T]he duty of loyalty runs to the existing client, and is not subordinate to any duty owed to a later-acquired client."). However, the Court has since found *Friskit* inconsistent with governing California state law. *See Fujitsu Ltd. v. Belkin Int'l, Inc.*, 2010 WL 5387920 (N.D. Cal. Dec. 22, 2010). As stated by Judge Koh in *Fujitsu*,

> Although this case does support Fujitsu's proposed rule, it does not appear to represent the prevailing view in California courts. Not only did the court in [*Truck Ins. Exch. v. Fireman's Fund Ins. Co.*, 6 Cal. App. 4th 1050 (1992)] not make a distinction between pre-existing and later-acquired clients, but a more recent California Court of Appeal decision also failed to make such a distinction. According to that court, "a lawyer may not avoid the automatic disqualification rule applicable to concurrent representation of conflicting interests by unilaterally converting a present client into a former client." *Pour Le Bebe, Inc. v. Guess? Inc.*, 112 Cal. App. 4th 810, 822 (2003) (quoting *Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*, 96 Cal. App. 4th 1017, 1037 (2002)) (quotation marks and alterations omitted).

> Furthermore, in the case with facts most similar to the case at hand, the California Court of Appeal reversed the trial court and granted the defendant's motion to disqualify the law firm in Baker Botts' position. In *State Farm Mut. Auto. Ins. Co. v. Fed. Ins. Co.*, 72 Cal. App. 4th 1422, 1428 (1999), the law firm of McCormick, Barstow, Sheppard, Wayte & Carruth originally represented State Farm in an insurance dispute. That dispute potentially implicated Federal Insurance Company ("Federal") as an additional insurer with coverage obligations to State Farm's insured. Before State Farm brought any formal lawsuit against Federal, Federal engaged McCormick in a separate, unrelated matter. While that matter was ongoing, McCormick brought an action against Federal on behalf of State Farm. After Federal's matter involving McCormick settled, Federal moved to disqualify McCormick's representation of State Farm. In granting the motion to disqualify, the court applied the per se rule of

ownership interest. In any event, the "important question" is why McDermott, if it ever eventually became aware of its concurrent obligations to opposing clients, did not "notify the parties and, unless they both agreed to waive the conflict, withdraw from this dispute." *Concat*, 350 F. Supp. 2d at 821.

Indeed, even if the engagement letter with its prospective waiver had been obtained, "[u]nder the law of this jurisdiction, . . . the attorney must request a second, more specific waiver, 'if the [prospective] waiver letter insufficiently disclosed the nature of the conflict that subsequently arose between the parties.'" *Id.* (quoting *Visa*, 241 F. Supp. 2d at 1106). McDermott, admittedly, did not do this.

15

disqualification that applies to concurrent representation. It stated that "so inviolate is the duty of loyalty to an existing client that the attorney cannot evade it by withdrawing from the relationship." *Id.* at 1431 (citation omitted).

The factual similarities between the *State Farm* case and this case persuade the Court that the holding in *State Farm* should apply. Baker Botts represented Fujitsu in a dispute with Netgear. Like the dispute in *State Farm*, that dispute eventually ripened into a lawsuit. During the time that Baker Botts represented Fujitsu, it took on Netgear as a client. Just as the settlement in *State Farm* did not lead the court to abandon the per se disqualification rule, Baker Botts' withdrawal as counsel for Netgear did not cure its concurrent representation conflict. Therefore, the per se rule of disqualification still applies.

*Id.* at *7. This Court agrees with *Fujitsu*'s assessment of California law, and accordingly rejects MotionPoint's reliance on *Friskit*. Despite being McDermott's later-acquired clients, Shawe and Elting are still owed the same duty of loyalty as MotionPoint. Accordingly, the per se rule of disqualification applies to McDermott's concurrent representation conflict.

### E.   Delay, Disruption, and Policy Concerns

As noted above, in ruling on a motion to disqualify counsel, the Court must be mindful of numerous factors, including the party's right to counsel of choice, an attorney's interest in representing a client, the financial burden on a client of replacing disqualified counsel, and any tactical abuse underlying a disqualification proceeding along with the preservation of public trust in the scrupulous administration of justice and in the integrity of the bar inherent in the rules of ethics.

MotionPoint argues that TransPerfect brings this Motion for tactical rather than substantive reasons. MotionPoint contends that Shawe and Elting "have known for over a year that McDermott simultaneously represented MotionPoint in this case and Ms. Elting and Mr. Shawe in estate planning matters," but only now, six months before trial, bring the Motion in order to "cause maximum damage to MotionPoint." Opposition at 17. Shawe and Elting counter that they first became aware of the conflict one month ago. The Court will not deny the Motion based on any delay because the Court cannot conclude that TransPerfect delayed bringing the Motion for tactical reasons.

As an initial matter, the parties dispute whether a court may consider delay in cases involving a concurrent conflict. TransPerfect argues that delay can be considered only in the context of successive conflicts; MotionPoint asserts that delay with resulting prejudice is applicable in all

16

contexts.  As noted above, in exercising its discretion, the Court can take into account a multitude of factors, including "the possibility that tactical abuse underlies the disqualification motion." *SpeeDee Oil*, 20 Cal. 4th at 1145.   In determining whether tactical abuse motivates the disqualification motion, it is common sense to look for any unexplained delay from the moving party that evidences such a motivation.  *See Certain Underwriters*, 264 F. Supp. 2d at 925 (assessing whether a motion to disqualify based on concurrent representation should be denied based on tactical motivations evidenced by the alleged delay in bringing the motion).

At the same time, delay and prejudice alone, without a suggestion of tactical abuse, does not appear sufficient to deny a disqualification motion based on concurrent representation.  MotionPoint cites no California case, and the Court finds none, outside of the successive conflict context that denies a disqualification motion upon only a finding of delay and prejudice.  Rather, the language in the cases establishing the delay exception is limited to motions based on successive representation.  In *River W., Inc. v. Nickel*, 188 Cal. App. 3d 1297, 1309 (1987), the California Court of Appeals articulated an unreasonable delay test specific to successive conflict cases.  After explaining that a "substantial relationship" between the prior matter and the present dispute must be established in order for there to be a successive conflict warranting disqualification, the court stated that,

> it is not in the interests of justice to make the "substantial relationship" rule *so unyielding* as to permit the former client to inexcusably postpone objections without penalty. Therefore, a narrow exception should apply if the present client, by way of opposition, offers prima facie evidence of an unreasonable delay by the former client in making the motion and resulting prejudice to the current client. The trial court must have discretion to find laches forecloses the former client's claim of conflict.

*River West*, 188 Cal. App. 3d at 1309.  The court went on to conclude that the delay was unreasonable and the resulting prejudice so great, "that the law must assume an implied waiver of the right to disqualify . . . ." *Id.* at 1313.  Similarly, in *Trust Corp. of Mont. v. Piper Aircraft Corp.*, 701 F.2d 85, 87-88 (9th Cir. 1983), the Ninth Circuit stated,

> It is well settled that a *former* client who is entitled to object to an attorney representing an opposing party on the ground of conflict of interest but who knowingly refrains from asserting it promptly is deemed to have waived that right. . . . Under these circumstances, we hold that Trust Corp.'s failure to object within a reasonable time, coupled with the long delay

17

United States District Court
Northern District of California

in filing a motion to disqualify, constitute a de facto consent to the Jardine firm's continued representation of Piper and a waiver of its right to object.

(emphasis added); *see also Blue Water Sunset, LLC v. Markowitz*, 192 Cal. App. 4th 477, 486-87 (2011) (declining to consider delay because it found the conflict to be concurrent and not successive and therefore the exception to disqualification based on delay did not apply); *Cal. Earthquake Auth. v. Metro. W. Sec., LLC*, 712 F. Supp. 2d 1124, 1133 (E.D. Cal. 2010) (stating that "it is not clear that delay is a factor that should be taken into account by the court in a situation involving concurrent, as opposed to successive, representation").

Limiting the delay exception to only the successive representation context is supported by the different interests involved with both conflicts—the duty of confidentiality for successive conflicts, and the duty of loyalty for concurrent conflicts. The duty of loyalty applies even though the simultaneous representations have nothing in common and there is no risk that confidences will be revealed, whereas the duty of confidentiality will disqualify counsel only where there is a "substantial relationship" between the two matters. *See Flatt*, 9 Cal. 4th at 284. The delay exception's limitation is consistent with the higher level of difficulty associated with disqualifying counsel due to a successive conflict as opposed to a concurrent conflict.

Turning to the record in this case, it is undisputed that Shawe knew MotionPoint was being represented by McDermott in this litigation prior to becoming a McDermott client himself. See Freed Decl. Ex. B (Nov. 8, 2010 Shawe-MotionPoint Email). However, it is disputed whether Shawe realized his attorney, McCaffrey, left Weil and joined McDermott in April 2011. Although Shawe signed a file transfer form, providing his consent to transfer his files from Weil to McDermott and continuing his representation with McCaffrey, Shawe states that he does not remember signing the form, which he attributes to the "ministerial, unremarkable, and insignificant" way it was presented. Shawe Decl. ¶ 12. Shawe further states that he typically receives more than 1,000 emails per day, "and does not have the time to read every form sent to him by his attorneys." *Id.* at ¶ 13. However, not only did Shawe—a sophisticated businessman—sign the transfer forms, McCaffrey states that she *told* Shawe that she was leaving for McDermott when he asked that she draft a prenuptial agreement on his behalf. *See* McCaffrey Decl. ¶ 4. The Court accordingly concludes that

United States District Court
Northern District of California

1    Shawe became aware that McCaffrey left Weil to join McDermott in April 2011.  He also knew that

2    McDermott represented MotionPoint in this litigation.

3         At the same time, it is also apparent that Shawe was surprised when Stone informed him in

4    May 2012 that McCaffrey worked at McDermott, the same firm adverse to TransPerfect in this

5    litigation.  *See* Stone Decl. Ex. B.  To the Court, the reason for this is evident: as Shawe explained,

6    he did not attach any significance to the ministerial act of signing a file transfer document, or of his

7    lawyer moving from one firm to another.  MotionPoint offers no reason to question the authenticity

8    of these emails, and the Court finds none.  The emails between Shawe and Stone undermines any

9    suggestion that TransPerfect brings this Motion based on a tactical motivation because once Shawe

10   became aware of, or remembered, the conflict, he took immediate action and contacted his lawyers.

11        Additionally, the fact that McDermott sent Shawe billing invoices throughout the

12   representation, including a May 4, 2012 invoice, does not establish that the Motion is brought for an

13   impermissible purpose since the invoices appear to have been sent to TransPerfect's New York

14   office and were paid by Stone.  Stone Decl. ¶ 7.  Finally, McCaffrey states that while at McDermott

15   she "primarily interacted" with Stone, not Shawe or Elting.  McCaffrey Decl. ¶ 11.  Although

16   McCaffrey attests that she has exchanged approximately fifteen emails with Shawe since joining

17   McDermott using her firm email address, she does not provide these emails, and she does not state

18   when these conversations took place.  *See id.* at ¶ 19.

19         Regarding Elting, there is not a sufficient basis for this Court to conclude that she had

20   knowledge of the conflict prior to being informed by Shawe in May 2012.  First, it is not clear that

21   she was aware prior to May 2012 that McDermott represented MotionPoint.  *See* Elting Decl. ¶ 12.

22   She states that when she "apparently" signed the file transfer form in April 2011, she had little to no

23   involvement with this litigation, and did not know that McDermott was representing MotionPoint.

24   *Id.*  While signing the transfer form is enough to convince the Court that Elting knew of

25   McDermott's representation of her, the Court cannot conclude that Elting knew that McDermott also

26   represented MotionPoint.  Accordingly, it has not been shown that Elting knew of the conflict and

27   caused TransPerfect to delay bringing the Motion for tactical reasons.

28

The Court nevertheless recognizes that "disqualification is a drastic measure," *Crenshaw v. MONY Life Ins. Co.*, 318 F. Supp. 2d 1015, 1020 (S.D. Cal. 2004) (citation omitted), that will impact both McDermott and MotionPoint.  To force MotionPoint to find new counsel would deny MotionPoint of their chosen counsel through no fault of their own.  Additionally, with trial six months away, MotionPoint will be forced to expedite their search for new counsel and will need to pay the cost of bringing their new lawyers up to speed.

In spite of these concerns, the Court grants TransPerfect's Motion.  McDermott clearly accepted clients whose interests were adverse to each other.  Despite the connection Shawe and Elting have with TransPerfect, McDermott's conflicts check failed to reveal the problem.  Additionally, McDermott's failure to monitor the return of its standard, prospective-waiver engagement letters does not support forgiving McDermott's breach of its duties.

The policy reasons supporting the disqualification rule also favor disqualification.  As the California Supreme Court has stated, "[a]ttorneys have a duty to maintain undivided loyalty to their clients to avoid undermining public confidence in the legal profession and the judicial process." *SpeeDee Oil*, 20 Cal.4th at 1146.  Once McDermott accepted Shawe and Elting as clients, the firm owed them a duty of loyalty.  McDermott breached that duty by representing MotionPoint in advancing its patent infringement claims against TransPerfect.  Although the consequence of that breach does negatively impact MotionPoint, McDermott's first client, allowing McDermott to avoid that consequence by simply withdrawing as counsel for Shawe and Elting, secondly acquired but nonetheless fully engaged clients, is not the best way to restore confidence in the legal profession. *See Fujitsu*, 2010 WL 5387920, at *8.

Moreover, courts must protect a client's legitimate expectations of loyalty.  *See SpeeDee Oil*, 20 Cal. 4th at 1147; *see also Fujitsu*, 2010 WL 5387920, at *9.  Although MotionPoint's claim to McDermott's loyalty lasted longer than Shawe's and Elting's, that does not alter the fact that Shawe and Elting had the same claim to undivided loyalty once McDermott accepted them as clients.  Once a client engages a lawyer, that client must be able to expect undivided loyalty.  McDermott's concurrent representation—which has already resulted in McDermott deposing its own client, Shawe—does not fulfill this expectation.  Unfortunately for McDermott, "in California, the solution

United States District Court
Northern District of California

20

to a direct, concurrent conflict in client loyalties is per se disqualification." *Fujitsu*, 2010 WL 5387920, at *9.

## IV.     CONCLUSION

For the reasons stated above, the Court GRANTS the Motion for Disqualification of Counsel.

IT IS SO ORDERED.

Dated: June 20, 2012

_____

JOSEPH C. SPERO

United States Magistrate Judge