IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRANSPERFECT GLOBAL, INC., TRANSPERFECT TRANSLATIONS INT'L, INC., and TRANSLATIONS.COM, INC., | No. C 10-2590 CW |
| Plaintiffs, | ORDER REGARDING CROSS-MOTIONS FOR CLAIM CONSTRUCTION AND SUMMARY |
| v. | JUDGMENT (Docket No. 246) |
| MOTIONPOINT CORP., | |
| Defendant. | |

Plaintiffs and Counterclaim-Defendants Transperfect Global, Inc., Transperfect Translations International, Inc., and Translations.com, Inc. (collectively, Transperfect) and Defendant and Counter-Claimant MotionPoint Corporation dispute the meaning of claims in four MotionPoint patents: U.S. Patent Nos. 7,584,216 ('216 patent), 7,627,479 ('479 patent), 7,580,960 ('960 patent), and 7,627,817 ('817 patent).  The parties also dispute the meaning of claims in three Transperfect patents: U.S. Patent Nos. 7,207,005 ('005 patent), 6,526,426 ('426 patent), and 6,857,022 ('022 patent).  Finally, the parties cross-move for summary judgment of non-infringement on their respective patents.  After considering the parties' submissions and oral argument, the Court construes the disputed terms as set forth below, denies Transperfect's motion for summary judgment, and grants in part and denies in part MotionPoint's cross-motion for summary judgment.

BACKGROUND

Transperfect and MotionPoint are competing language translation firms whose clients include website operators seeking

to offer content in multiple languages.  To serve these clients, both companies rely on a cloud-oriented system known as "proxy-based translation," which allows a website operator to offer its content in different languages without having to create a separate website in each language.  Using such a system, the client simply maintains its website in a single language while the translation firm generates, stores, and hosts a translated version of the website on a proxy server.  Typically, the firm does this by monitoring the client's website for content changes or updates, copying any new content it identifies onto the proxy server, and translating that content into the desired foreign language using some combination of human and machine translators.  The firm then makes the translated content available through a proxy website to any person who seeks to access the client's website in the foreign language.

All seven patents-in-suit disclose elements of a proxy-based translation system.  The parties dispute the meaning of seventeen claim terms, most of which appear multiple times in these patents. The terms appear in claims 1-5, 7, 9-12, 14-15, 17-20, and 22-23 of Transperfect's '426 patent; claims 1-2, 4-5, and 7-8 of Transperfect's '005 patent; claims 1, 6, 10-12, 17, 22, and 26-28 of Transperfect's '022 patent; claims 1, 11, 27, and 36 of MotionPoint's '216 patent; claims 1, 16, 21-22, and 32-33 of MotionPoint's '479 patent; claims 1, 14-16, and 30-32 of MotionPoint's '960 patent; and claims 1, 10-12, 18, 20, 23, and 32-34 of MotionPoint's '817 patent.

DISCUSSION

I.   Claim Construction

     A.   Legal Standard

     The construction of a patent is a matter of law for the Court.  Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996).  "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Accordingly, in construing disputed terms, the Court first looks to the words of the claims.  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). Generally, the Court ascribes the words of a claim their ordinary and customary meaning.  Id.  The Federal Circuit instructs that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  Phillips, 415 F.3d at 1313.  Other claims of the patent in question can also assist in determining the meaning of a claim term.  Id. at 1314. "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims."  Id.

     The Federal Circuit also instructs that claims "must be read in view of the specification, of which they are a part."  Id. at 1315 (quoting Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)).  The specification must contain a

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

description of the invention that is clear and complete enough to enable those of ordinary skill in the art to make and use it, and thus the specification is "always highly relevant" to the Court's claim construction analysis. Vitronics, 90 F.3d at 1582. "Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." Id. In some cases, the specification may reveal that the patentee has given a special definition to a claim term that differs from its ordinary meaning; in such cases, "the inventor's lexicography controls." Phillips, 415 F.3d at 1316. The specification also may reveal the patentee's intentional disclaimer or disavowal of claim scope. "In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." Id. However, claims are not limited to the preferred embodiment described in the specification. See SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc; plurality opinion).

While emphasizing the importance of intrinsic evidence in claim construction, the Federal Circuit has authorized courts to rely on extrinsic evidence, which consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Phillips, 415 F.3d at 1317 (quoting Markman, 52 F.3d at 980). While extrinsic evidence may be useful to the Court, it is less significant than intrinsic evidence in determining the legally operative meaning of claim language. Phillips, 415 F.3d at 1317-18; see also C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004). Furthermore, extrinsic evidence is unlikely

to lead to a reliable interpretation of claim language unless considered in the context of the intrinsic evidence. <u>Phillips</u>, 415 F.3d at 1319.

B.   Disputed Terms of '426 and '005 Transperfect Patents

The parties dispute eight terms in Transperfect's '426 and '005 patents.  Although each of these terms appear in multiple claims, the following three claims from the '426 patent suffice to illustrate how these terms are used throughout the patent.[1]  Six of the disputed terms in appear in claim 1, which reads as follows, with the disputed terms in bold:

> A process for managing, tracking, accounting and
> translating multilingual electronic content in a
> computer environment, comprising the steps of:
> **detecting when** a document, data stream, or non-text file
> in a **master language** has been updated;
> notifying the **user** which corresponding documents, data
> streams, or non-text files in the other languages
> require translation;
> allowing the **user** to initiate the translation of a
> document, data stream, or non-text file and its
> constituent or dependent elements;
> converting said document, data stream, or non-text file
> and its constituent or dependent elements requiring
> translation to an **internal format**;
> **staging the translation** of said document, data stream,
> or non-text file and its constituent or dependent
> elements; and
> **dynamically routing and sequencing** said document, data
> stream, or non-text file and its constituent or
> dependent elements to the appropriate translation
> resources, wherein said routing and sequencing is
> performed according to any of: the subject matter of
> the document to be processed, target language of the
> translation, and whether draft-only or high quality
> is required.

---

[1] The subheadings below identify where each disputed term appears in each patent.

**United States District Court**
For the Northern District of California

'426 patent col. 52:28-:53.  Another disputed term, "pipeline,"

appears multiple times in claim 7, which states in relevant part:

> A process for managing, tracking, accounting and
> translating multilingual electronic content in a
> computer environment, comprising the steps of:
> detecting when a document, data stream, or non-text file
> in a master language has been updated;
> notifying the user which corresponding documents, data
> streams, or non-text files in the other languages
> require translation;
> sending documents, data streams, or non-text files to be
> translated down a **pipeline**, wherein said **pipeline** is
> connected to a plurality of translation resources
> using one or more open Application Programming
> Interfaces (API);
> sending packets to translation resources through said
> Adaptor, wherein work packets are converted to the
> appropriate translation resource format before
> sending said converted work packet to said
> translation resource;
> receiving packets from translation resources through
> said Adaptor, wherein received packets are converted
> back to the work packet format and the status and
> control information are updated in said work packet
> before sending said converted received packet to said
> **pipeline**;
> wherein said one or more open API allow a variety of
> translation resources to be connected to said
> **pipeline** . . .

Id. col. 53:45-54:7.  The eighth and final disputed term in the

'426 patent, "a module for," appears throughout claim 9:

> An apparatus for managing, tracking, accounting and
> translating multilingual electronic content in a
> computer environment, comprising:
> **a module for** detecting when a document, data stream, or
> non-text file in a master language has been updated;
> **a module for** notifying the user which corresponding
> documents, data streams, or non-text files in the
> other languages require translation;
> **a module for** allowing the user to initiate the
> translation of a document, data stream, or non-text
> file and its constituent or dependent elements;

> **a module for** converting said document, data stream, or
>         non-text file and its constituent or dependent
>         elements requiring translation to an internal format;
> **a module for** staging the translation of said document,
>         data stream, or non-text file and its constituent or
>         dependent elements; and
> **a module for** dynamically routing and sequencing said
>         document, data stream, or non-text file and its
>         constituent or dependent elements to the appropriate
>         translation resources, wherein said routing and
>         sequencing is performed according to any of: the
>         subject matter of the document to be processed,
>         target language of the translation, and whether
>         draft-only or high quality is required.

Id. col. 54:11-:36.  The following subsections address the construction of these eight terms.

> 1.   "Detecting when"
>         '426: 1, 5, 7, 9, 14-15, 17, 22-23;
>         '005: 1, 4, 7.

The parties dispute the meaning of the term "detecting when," which describes how the translation system disclosed in Transperfect's '426 and '005 patents identifies new content on the original-language website.  This dispute essentially revolves around whether the word "when" should be given its temporal meaning (i.e., "at which time") or its conditional meaning (i.e., "if"), both of which are commonly recognized by many English dictionaries.  See, e.g., Webster's 3d New Int'l Dictionary 2062 (Philip B. Gove ed., 1993).

Transperfect contends that the term should be given its conditional meaning.  For support, it cites other uses of the term "when" in the specification[2] and argues that, in those contexts, the word is used "to mean 'if' and not to identify a time or date."  Docket No. 272, Transperfect Stmt. Re: Claim Constr., at

---

[2] The specification for the '005 patent is identical to the specification for the '426 patent in all relevant respects.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  2.[3]   In each of the instances Transperfect cites, however, the

2  meaning of "when" is ambiguous and the term is susceptible to

3  either the temporal definition or the conditional definition.

4      MotionPoint, in contrast, relies on other language from the

5  specification to argue that "when" must be given its narrower,

6  temporal definition.  It highlights a sentence which states that

7  the disclosed system will "immediately alert the Web site manager"

8  when new or updated content is added to the original-language

9  version of the website.  '426 patent col. 11:39-:42; '005 patent

10 col. 11:48-:51 (emphasis added).  Critically, the specification

11 does not state that the website manager will be "immediately"

12 alerted if new original-language content is detected; rather, it

13 says that the notification will occur "[i]f a document in the

14 master language is [] updated."  '426 patent col. 11:37-38

15 (emphasis added); '005 patent col. 11:47-:48 (same).  This

16 suggests that the detection of the new content occurs

17 "immediately," because the notification itself occurs immediately.

18     In light of this language in the specification, the term

19 "detecting when" must be given its temporal meaning.  See Athletic

20 Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1581 (Fed.

21 Cir. 1996) ("Where there is an equal choice between a broader and

22 a narrower meaning of a claim, and there is an enabling disclosure

23 that indicates that the applicant is at least entitled to a claim

24

25     [3] MotionPoint objects to Transperfect's unauthorized submission of
a supplemental post-hearing brief in support of its claim construction
26 motion.  Because Transperfect's supplemental brief does not provide any
new information or argument, this order does not rely on it.
27 MotionPoint's objection is therefore overruled as moot.  The Court
relies only on the post-hearing submissions that it specifically
28 requested -- namely, the parties' joint statement and Transperfect's
citations to the summary judgment record.

having the narrower meaning, we consider the notice function of the claim to be best served by adopting the narrower meaning."). Because MotionPoint's proposed construction -- "monitoring as" -- does not clearly convey this meaning, the Court construes the disputed term as "discovering immediately at the time that" so that the term's temporal meaning is explicit.[4]

Transperfect requests, as an alternative, that the Court construe the term as: "detecting at some predetermined intermittent interval." Transperfect Stmt. Re: Claim Constr. 2. Although this proposed construction would recognize the temporal meaning of "when," Transperfect has not identified any support for this particular construction in the record. Accordingly, the Court declines to adopt this alternative.

2. "Master language"
'426: 1, 5, 7, 9, 14-15, 17, 22-23;
'005: 1, 4, 7.

The parties initially disputed the meaning of the term "master language" but now agree that the term refers to the original language of a website that will be translated into a different language. At the hearing, they jointly proposed that the term be construed as "reference language." Although the Court accepts the parties' general explanation of this term, it construes the term as "original language" in order to minimize the potential for juror confusion.

---

[4] Transperfect's assertion that MotionPoint did not timely disclose its proposed construction of "detecting when" is baseless. MotionPoint disclosed this proposed construction in the parties' joint claim construction statement, submitted on April 5, 2012, see Docket No. 120, at 3, and in one of MotionPoint's expert reports.

9

3.  "User"
    '426: 1-5, 7, 9-12, 14-15, 17-20, 22, 23;
    '005: 1, 2, 4-5, 7-8.

The parties dispute the meaning of the term "user."  While MotionPoint asserts that the term refers only to the manager of the original-language content or his or her agents, Transperfect contends that the term refers to any person who uses the translation system, regardless of whether that person manages the original-language content.  In other words, MotionPoint contends that "user" refers exclusively to the website manager employed by the client whose website requires translation, while Transperfect contends that it may refer both to the client's employees and to employees of the translation firm itself.

The specification suggests that "user" refers only to the manager of the original-language content and not to employees of the translation firm.  In describing the invention, the specification for both the '426 and '005 patents refers to the original-language website that will be translated as the "user's site."  Specifically, it states, "The user is notified of the completion of translation and the invention coordinates the delivery of the translated documents, data streams, or non-text files back to the user's site for installation and review."  '005 patent col. 2:33-:37; '426 patent col. 2:29-32 (emphasis added).  This language negates the broader construction of the term that Transperfect proposes.

Accordingly, the Court construes "user" as "manager of the original-language content or his or her agents (e.g., the website manager)."  The Court declines to adopt MotionPoint's proposed construction, "manager of the master language content (e.g.,

Website manager),” in light of the Court’s construction of the term, “master language,” which is discussed above.

### 4.   “Pipeline”
'426: 7, 15, 23.

At the hearing, the Court proposed that the term “pipeline” be construed as “a list of tasks to be performed.”  Although Transperfect acceded to this construction at the hearing, MotionPoint objected on the grounds that it lacked sufficient specificity.  However, MotionPoint failed to offer a viable alternative.

MotionPoint’s proposed construction -- “a transport layer for scheduled dispatch of documents to translation resources” -- is both convoluted and overly restrictive.  It not only introduces a confusing term, “transport layer,” but also renders the claim’s subsequent reference to “translation resources” redundant.  Thus, MotionPoint’s proposed construction must be rejected.

Because MotionPoint has not raised any compelling objections or an understandable alternative to the Court’s proposed construction, the Court construes “pipeline” as “a list of tasks to be performed.”

### 5.   “Internal format”
'426: 1, 5, 9, 14, 17, 22.

The parties generally agree that the term “internal format,” as used in the patents, refers to the way that the invention stores original-language content before it is translated.  They disagree, however, about how to convey this meaning in plain language.

**United States District Court**
For the Northern District of California

The Court construes the term as an "arrangement of digital data in a file suitable for use within the claimed system." Although Transperfect objects to the use of the word "digital," the language of patent makes clear that this is an appropriate limitation.  All six of the claims that use the term, "internal format," disclose a process for "translating multilingual electronic content in a computer environment." '426 patent col. 52:30-:31, 53:14-:15, 54:12-:13, 55:7-:8, 56:4-:5, 57:2-:3 (emphasis added).

> 6.   "Staging the translation"
>       '426: 1, 5, 9, 14, 17, 22.

At the hearing, the Court proposed that the term "staging the translation" be construed as "preparing for translation."  Because both parties agreed that this proposal was acceptable, the Court adopts this construction.

> 7.   "Dynamically routing and sequencing"
>       '426: 1, 5, 9, 14, 17, 22.

The parties generally agree that the term "dynamically routing and sequencing" means continually routing and sequencing original-language documents (or other types of files) in response to changing criteria.  Once again, however, they disagree about how to convey this meaning in plain language.

At the hearing, the Court directed the parties to propose new language that would make clear that the disclosed translation system is capable of responding to changing criteria.  MotionPoint contends that the construction must also reflect that this process occurs "in real time" because the patent's use of the word, "dynamically," suggests that this process occurs rapidly.  Docket

United States District Court
For the Northern District of California

No. 271, Joint Stmt. Re: Claim Constr., at 4.  The Court agrees that the word, "dynamically," indicates that the claimed step occurs "in real time."  See Random House Dictionary (May 6, 2013, 11:30 a.m.), http://dictionary.reference.com/browse/dynamic (illustrating the meaning of the word "dynamic" with the sentence: "Dynamic Web sites contain Web pages that are generated in real time." (emphasis added)).  However, because the phrase "in real time" would not be clear in this context, the Court construes the disputed term as "routing and sequencing, with the capacity to re-route and re-sequence while operating, in response to changing criteria."

        8.    "A module for . . ."
            '426: 9-12, 14-15;
            '005: 4-5.

The parties dispute whether the term "a module for . . ." represents a means-plus-function limitation that must be construed according to 35 U.S.C. § 112, ¶ 6.  Typically, a claim term that does not use the word "means" will trigger the rebuttable presumption that § 112, ¶ 6 does not apply.  However, this presumption can be rebutted if "the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'"  CCS Fitness v. Brunswick Corp., 288 F.3d 1359, 1369 (Fed. Cir. 2002) (quoting Watts v. XL Sys., Inc., 232 F.3d 877, 880 (Fed. Cir. 2000)).  This "issue often reduces to whether skilled artisans, after reading the patent, would conclude that a claim limitation is so devoid of structure that the drafter constructively engaged

13

in means-plus-function claiming." <u>Inventio AG v. ThyssenKrupp</u>
<u>Elevator Americas Corp.</u>, 649 F.3d 1350, 1357 (Fed. Cir. 2011).

Here, the patents' claims recite function without reciting
any definite structure.  The relevant claims do not identify any
specific hardware or software for performing the functions listed
in each claim.  Instead, they refer simply to an "apparatus . . .
comprising: a module for" performing those functions.  These
generic references do not recite a sufficiently definite
structure.

Although MotionPoint correctly asserts that "a module
for . . ." must be construed as a means-plus-function limitation,
its briefs do not identify a specific structure to which the term
should be limited.  At the hearing, MotionPoint suggested that the
Court adopt, for each use of the term, the structure it proposed
for that term in the appendix to the parties' joint claim
construction statement.  <u>See</u> Docket No. 120, Ex. A, at 37-47.  The
Court has reviewed these proposed structures and agrees.
Accordingly, it construes each use of "a module for . . ." as a
means-plus-function limitation with the function and structure
proposed for each use by MotionPoint in the joint claim
construction statement.

C.   Disputed Terms of '022 Transperfect Patent

At the hearing, the parties disputed two terms in
Transperfect's '022 patent.  The first disputed term, "obtaining a
translation," appears once in claim 1 and twice in claim 17.  The
following excerpt offers an example of how the term is used:

> A single-action translation ordering system comprising:
> a single action translation component displayed
>     simultaneously with at least part of an electronic

United States District Court
For the Northern District of California

14

> communication comprising at least text of more than one word and one or more hyperlinks to further electronic communications, said translation component comprising an object identified as effecting a translation of said electronic communication in a single action;
> a communication network; and
> a translation manager in communication with said single action translation component via said communication network;
> said translation manager:
> > **obtaining a translation** of said electronic communication in response to a user clicking said single action translation component;
> > directing transmission of said translation of said electronic communication to said user; and
> > providing translation of said further electronic communications when said hyperlink is activated; by delivering a translation of said further electronic communications that was translated when said electronic communication was translated; or by **obtaining a translation** of said further electronic communications when said hyperlink is activated.

'022 patent col 8:51-9:10.  The other disputed term in the '022 patent appears only once, in claim 22:

> The system of claim 17 wherein said translation manager includes **means for effecting automatic translation of said communication**.

Id. col. 10:31-:33.

Prior to the hearing in this matter, the parties reached an agreement to construe the term "effecting a translation," which occurs in claims 1 and 17, as "bringing about a translation." They also agreed that the term "translation manager," which they previously disputed, does not require construction.

> 1.   "Obtaining a translation"
> > '022: 1, 17

The parties dispute the meaning of the term "obtaining a translation."  Both parties agree that the term refers to the translation system's process for translating new content from an original language into a different language.  They disagree, however, about whether the term also refers to the process of

15

United States District Court
For the Northern District of California

retrieving previously translated content that was rendered in response to a prior translation request.  MotionPoint contends that all content must be translated anew, including content that has already been translated, while Transperfect asserts that the invention is capable of recognizing and recalling content that has already been translated.

The specification contemplates at least one preferred embodiment of the system that can retrieve previously translated content without re-translating it.  The specification explains that this feature would make the system more efficient.  To illustrate this point, it highlights the example of a news website with "static heading content but dynamic news content."  '022 patent col. 3:23-:25.  The patent notes that, using one embodiment of the translation system, "the static content can be translated once and cached whereas the dynamic content must be translated each time a translation is requested."  Id.  MotionPoint's narrow construction of "obtaining a translation" would exclude this preferred embodiment and must therefore be rejected.  See SEB S.A. v. Montgomery Ward & Co., Inc., 594 F.3d 1360, 1369 (Fed. Cir. 2010).  While MotionPoint highlights another preferred embodiment of the invention that could make "recommendations on which pages should be permanently translated and into which languages," this does not necessarily preclude embodiments of the system that would perform permanent translations of certain pages automatically so as to avoid repeated translations of the same content.  What's more, as noted above, the preferred embodiment of an invention should not be used to impose limitations on disputed claim terms. See SRI Int'l, 775 F.2d at 1121.

16

**United States District Court**
For the Northern District of California

Accordingly, the Court construes the term "obtaining a translation" as "bringing about a new or retrieving an existing translation."

        2.   "Means for effecting automatic translation of said communication"
            '022: 22

Although the parties initially disputed this term, they have since reached an agreement to construe the term as a means-plus-function limitation with the following function and structure:

Function: effecting automatic translation of said communication.

Structure: translation engines or software programs; translation sites with translation engines or software programs.

The Court finds the parties' joint proposal reasonable and therefore adopts their proposed construction.

      D.   Disputed Terms of '216, '479, '817, and '960 MotionPoint Patents

The parties dispute the meaning of seven claim terms that appear in MotionPoint's four patents.  The following four claims -- one from the '216 patent, two from the '479 patent, and one from the '960 patent -- illustrate how these disputed terms are used throughout MotionPoint's patents.

The first disputed claim term, "human translation," appears throughout MotionPoint's '216, '960, and '479 patents.  Claim 1 of the '479 patent offers an example of how the term is used:

A machine implemented method for managing language translation, comprising the steps of:
crawling an origin web site hosting content in a first language via following publicly accessible links to additional pages;
identifying a portion of the content in the first language that is not yet translated to the second language; . . .

17

translating the translatable components into a second
    language using **human translation**; . . .

'479 patent col. 32:31-:50.

Claim 1 of the '216 patent exemplifies three more disputed

terms:

A machine implemented method for providing translated
web content, comprising the steps of:
receiving a first request from a user for content in a
    second language translated from content in a first
    language from a first Internet source;
retrieving the content in the first language from the
    first Internet source;
**dividing** the content in the first language into a
    plurality of translatable components, wherein a
    translatable component includes a **segment of text**;
determining whether there are translatable components
    for which no corresponding translation is found in a
    database that stores translations for translatable
    components generated previously;
**scheduling** for translation of translatable components
    that do not have corresponding translations in the
    database and using a human translator to translate
    each translatable component into the second language,
    wherein each segment of text is translated as a unit;
storing into the database the translations of the
    translatable components as translatable components;
receiving a second request from a user for the
    translated content in the second language
    corresponding to the content in the first language
    from the first Internet source;
retrieving the content in the first language from the
    first Internet source;
**dividing** the received content in the first language into
    a plurality of translatable components;
generating the translated content in the second language
    by modifying the received content in the first
    language so that each translatable component is
    replaced with a corresponding translated component
    stored in the database; and
sending the translated content to the user as a response
    to the second request.

'216 patent col. 32:51-33:19.

Claim 30 of the '479 patent provides another disputed term:

A machine implemented method for managing language
translation, comprising the steps of: **scheduling content
in a first language for translation by storing content**
in the first language accessed via following publicly
accessible links from a web server that hosts the
content in the first language . . . .

United States District Court
For the Northern District of California

'479 patent col. 35:55-:60.

And claim 1 of the '960 patent discloses the final disputed term:

> A machine implemented method for **synchronizing** content in different languages, comprising the steps of: accessing from a web server via a publicly available network path, content in a first language, including content retrieved by crawling a website . . . .

'960 patent col. 32:36-:41.

1. "Human translation"
'960: 4, 19, 35
'479: 1, 16, 21, 30
'216: 20

MotionPoint's '216, '960, and '479 patents all feature claims that use the term "human translation."  Transperfect contends that this term is indefinite because MotionPoint's patents disclose a machine-based translation system and, thus, the patents' claims should be "limited to steps or functions performed without human intervention."  Transperfect Mot. Claim Constr. & Summ. J. 14.

This argument ignores the plain language of the patent specifications.  Each of MotionPoint's patents expressly contemplates human involvement at the translation stage.  Indeed, the specifications make clear that one of the principal benefits of proxy-based translation systems over machine-only translation systems is the ability to obtain more readable translations by using human translators.  The '216 patent states, "The present invention is further advantageous because it allows for the use of human translation, thereby producing a high quality translation of the original web site in another language.  This is beneficial as it reduces or avoids the use of machine translation, which can be of low quality."  '216 patent col. 4:1-:5.  The '960 and '479

19

**United States District Court**
For the Northern District of California

patents similarly recognize that human translation could be used to complement machine translation within the disclosed translation systems.  '479 patent col. 21:16-:19 ("The translation server 400 can use real-time machine translation in the event that a human translation is not yet available for a text segment."); '960 patent col. 21:23-:25 (same).  Thus, while MotionPoint's patents rely exclusively on computers at other stages of the process -- for instance, in retrieving data from an original-language website or dividing that data into text and image files -- they expressly acknowledge that humans may play a role at the language translation stage.  In short, ample intrinsic evidence shows that the term, "human translation," is not indefinite.  The Court therefore construes the term according to its plain and ordinary meaning, namely, as "translation performed by a human."

> 2.   "Segment of text"
> '216: 1, 27, 36

Transperfect argues that the term "segment of text" should be construed as a "chunk of text on the page as defined by the HTML that surrounds it."  It bases its proposed construction on the '216 patent specification, which states, "A text segment is a chunk of text on the page as defined by the HTML that surrounds it."  '216 patent col. 11:60-:62.  MotionPoint contends that this language does not control and that Transperfect's proposed construction -- particularly the reference to HTML -- is unduly narrow.

Because the specification provides a clear definition of the disputed term, the "inventor's lexicography controls." Phillips, 415 F.3d at 1316.  MotionPoint's reliance on extrinsic evidence to

United States District Court
For the Northern District of California

define the term more broadly is unavailing as is its contention that someone of ordinary skill in the art would understand "segment of text" to mean something other than the definition provided in the specification.  The Federal Circuit has specifically held that the specification's definition is dispositive even when it "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess."  Id.  Contrary to MotionPoint's assertion at the hearing, an inventor is not required to provide "a statement in the form of 'I define _____ to mean _____'" in order to define or re-define a specific term in the patent. Astrazeneca AB v. Mutual Pharm. Co., 384 F.3d 1333, 1339 (Fed. Cir. 2004) (holding that "such rigid formalism is not required"); see also  Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc., 262 F.3d 1258, 1268 (Fed. Cir. 2001) ("[A] claim term may be clearly redefined without an explicit statement of redefinition.").

Other references to "text segments" in the patent also indicate that HTML constitutes part of the term's definition.  For instance, the patent states that the "parsing system is flexible and allows defining, on per-customer basis, which HTML tags are formatting tags that should not break up text segments."  '216 patent col. 12:22-:23 (emphasis added); see also '216 patent col. 12:18-:19 ("By default, the parsing system breaks-up text segments according to the HTML tags in the page.").  These repeated references to the "HTML tags" of "text segments" further support the inventor's definition of the term.

21

United States District Court
For the Northern District of California

MotionPoint's contention that the doctrine of claim differentiation requires a broader construction of the term is unavailing.  The Federal Circuit has expressly held that "the doctrine of claim differentiation does not allow unrestrained expansion of claims beyond the description of the invention in the specification."  Tandon Corp. v. United States ITC, 831 F.2d 1017, 1024, 1028 (Fed. Cir. 1987).  The court has repeatedly recognized that the "doctrine of claim differentiation creates only a presumption, which can be overcome by strong contrary evidence such as definitional language in the patent." InterDigital Communications, LLC v. Int'l Trade Comm'n, 690 F.3d 1318, 1324 (Fed. Cir. 2012); see also Black & Decker, Inc. v. Robert Bosch Tool Corp., 260 Fed. App'x 284, 290 (Fed. Cir. 2008) (rejecting the district court's reliance on the doctrine of claim differentiation because "the presumption of scope applied to the independent claims under the doctrine of claim differentiation here does not overcome the definition from the intrinsic record"). In the present case, the '216 patent's clear definition of "segment of text" rebuts any presumption created by the doctrine of claim differentiation.[5]

---

[5] It is not clear that the doctrine of claim differentiation even supports a broader construction of the disputed term here.  The dependent claim that MotionPoint cites -- claim 11 -- does not use the term "segment of text" at all but, rather, uses the broader term, "translatable components," when discussing non-HTML "markup tag[s]." '216 patent col. 33:57-:59.  Because another claim in the patent -- claim 8 -- makes clear that the term "translatable components" encompasses not only "text segment[s]" but also "image file[s]," "audio clip[s]," and "video clip[s]," id. 33:40-:47, claim 11 cannot be read to eliminate the HTML-based limitation from the patent's definition of "segment of text."

**United States District Court**
For the Northern District of California

Accordingly, the Court construes "segment of text" as "a chunk of text on the page as defined by the HTML that surrounds it."

        3.    "Dividing," "Parsing," and "Parsed"
               '960: 1, 14, 15, 16, 30, 31, 32;
               '216: 1, 11, 24, 27, 36;
               '817: 1, 10-12, 18, 20, 23, 32-34

Transperfect contends that the terms "dividing," "parsing," and "parsed" should all be construed as "breaking-up the content into translatable components according to HTML tags surrounding each translatable component." Once again, Transperfect bases its proposed construction on the patent specifications, which state, "Parsing is the process of breaking-up an HTML page submitted for translation into its translatable and non-translatable components." '216 patent col. 11:46-48; '960 patent col. 11:51-:53; '817 patent col. 11:51-:53. MotionPoint argues that this language does not control and that Transperfect's proposed construction is too narrow. Specifically, MotionPoint argues that "dividing," "parsing," and "parsed" should not be construed to apply only to "HTML page[s]" because such a construction would

---

Another dependent claim -- claim 26, which MotionPoint fails to cite -- provides a slightly stronger basis for invoking the doctrine of claim differentiation; however, it still does not justify eliminating the HTML-based limitation from the definition of "segment of text." Claim 26 reads: "The method according to claim 1, wherein the plurality of translatable components include a text segment enclosed in an attribute of an HTML tag." Id. 34:59-:61. The specification makes clear that an "attribute of an HTML tag" is merely a specific kind of HTML tag. Thus, this claim -- the only claim in the entire '216 patent that even mentions HTML -- does not preclude the Court from including any HTML-based limitations in its construction of "text segment"; it simply precludes the Court from including a specific kind of HTML-based limitation (namely, an "attribute of an HTML tag") in its construction of "text segment." Accordingly, claim 26 does not require a broader construction of "segment of text" (or "text segment") under the doctrine of claim differentiation.

United States District Court
For the Northern District of California

1  undermine the patents' statement that the "parsing system is

2  flexible." '216 patent col. 12:22-:23; '960 patent col. 12:25-

3  :27; patent col. 12:27-:29.

4       While MotionPoint is correct that the specifications

5  contemplate some flexibility in the parsing system, this

6  flexibility does not preclude Transperfect's proposed

7  construction.  If anything, the sentence on which MotionPoint

8  relies appears to confirm that the patent uses the terms

9  "dividing," "parsing," and "parsed" to describe the division of

10 content based on HTML tags.  The full sentence reads: "The parsing

11 system is flexible and allows defining, on per-customer basis,

12 which HTML tags are formatting tags that should not break up text

13 segments." '216 patent col. 12:22-:23; '960 patent col. 12:25-

14 :27; patent col. 12:27-:29 (emphasis added).  Thus, the parsing

15 system's flexibility does not undermine Transperfect's proposed

16 construction.

17      MotionPoint next argues that Transperfect's proposed

18 construction is precluded by the doctrine of claim

19 differentiation.  Once again, however, this argument fails because

20 it would require an "expansion of claims beyond the description of

21 the invention in the specification." Tandon Corp., 831 F.2d at

22 1028.  The patents' express definition of "parsing" renders the

23 doctrine of claim differentiation inapplicable here.

24 InterDigital, 690 F.3d at 1324.  Furthermore, even if the doctrine

25 did apply, it would not preclude the Court from including "HTML

26 tags" within its construction of the terms "parsing" and

27 "dividing."  The dependent claims in the '817 or '960 patents do

28 not even mention HTML and, thus, cannot reasonably be read to

eliminate the term from the definition of "parsing" or dividing" in the independent claims.

   The Court therefore adopts the inventor's own lexicography and construes the terms "dividing," "parsing," and "parsed" as "breaking-up the content according to HTML tags."

### 4.   "Synchronizing" and "Synchronized"
####         '960: 1, 16, 32

   Transperfect contends that the terms "synchronizing" and "synchronized" should be construed as "modified/modifying to make the same as."  MotionPoint contends that this proposed construction does not accurately capture the meaning of "synchronized" as the term is used in claim 1 of the '960 patent. That claim describes how "updated content in the second language is synchronized with the accessed content in the first language." '960 patent col. 32:60-:61.  MotionPoint notes that, under the disclosed translation process, some of the "updated content in the second language" may have already been modified to match content in the first language and, in that situation, would not need to be modified again.

   To accommodate this situation that MotionPoint highlights, the Court adopts an amended version of Transperfect's proposed construction.  Rather than construing the terms "synchronizing" and "synchronized" as "modified/modifying to make the same as," the Court construes the terms as "modified/modifying, if necessary, to make the same as."  Transperfect agreed at the hearing that it found this amendment acceptable.

United States District Court
For the Northern District of California

     5.   "Scheduling"
        '216: 1, 27, 36;
        '479: 1, 16, 21-22, 32-33

Both the '216 and '479 patents use the term "scheduling" to describe how certain original-language content is placed in a queue for translation.  The parties dispute whether this content, under the disclosed translation inventions, must be translated in the same order in which it appears in the queue.  MotionPoint asserts that the content need not be translated in any specific order; Transperfect, in contrast, argues that the content must be translated in the same sequence in which it appears in the queue. Transperfect also contends that the disclosed inventions must identify the exact dates and times when every item in the queue will ultimately be translated.

MotionPoint's proposed construction ignores the plain and ordinary meaning of the word "schedule," which typically refers to a sequential order of events.  See, e.g., Random House Dictionary (May 6, 2013, 2:20 p.m.), http://dictionary.reference.com/browse/schedule?s=t (defining "schedule" as "a plan of procedure, usually written, for a proposed objective, especially with reference to the sequence of and time allotted for each item or operation necessary to its completion" (emphasis added)).  Because MotionPoint does not provide any compelling reasons to deviate from this traditional definition, its proposed construction must be rejected.

So, too, must Transperfect's proposed construction.  Although Transperfect at least recognizes that "scheduling" includes a sequential component, its proposed construction is overly restrictive.  It would require that the claimed inventions

United States District Court
For the Northern District of California

identify precise dates and times when every item in the queue will
be translated even though nothing in the patents supports such a
narrow construction of the term "scheduling."  Transperfect's
reliance on the patent specifications is unavailing.  While the
specifications describe how a web crawling program can be used to
check an original-language website for updates at specific times
of day, they do not suggest that content stored on the queue is
subsequently scheduled for translation at specific dates and
times.  What's more, even if the description of the web crawling
schedule did apply to the translation schedule, it cannot be read
as a claim limitation because the specification makes clear that
this description is merely illustrative.  The specification
states, "For example, if the ABC Widgets web site modifies its
sale offerings twice a week, such as on Mondays and Fridays at 12
AM, then the spider agent 404 can be scheduled to crawl the
relevant parts of the site shortly after (e.g., at 12:30 AM) on
those days."  '216 patent col. 28:50-:55; '479 patent col. 28:30-
:35 (emphases added).  This isolated illustration of the web
crawling stage does not support Transperfect's narrow construction
of claims describing an entirely different stage of the process.

    Thus, in light of both the specifications and the plain
meaning of the term, the Court construes "scheduling" as "placing
onto a list for translation in a specified sequence."

        6.   "Scheduling content in a first language by storing
             content"
             '479: 30-32

    Transperfect argues that this term is indefinite because the
words "scheduling" and "storing," as used in the patent,

27

United States District Court
For the Northern District of California

1  effectively mean the same thing: that is, placing original-

2  language content in a queue for subsequent translation.

3      This argument is unpersuasive because "scheduling" and

4  "storing" have different meanings in the context of the disputed

5  claim.  As noted above, "scheduling" refers to the process of

6  "placing [content] onto a list for translation in a specified

7  sequence."  The word "storing," in contrast, refers to the

8  specific location of that list: in this case, the translation

9  queue.  Transperfect's effort to conflate these two definitions is

10  insufficient to render the disputed claim term indefinite.  As the

11  Federal Circuit has held, claims should only be deemed indefinite

12  if they are "insolubly ambiguous."  <u>Exxon Research & Engineering</u>

13  <u>Co. v. United States</u>, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

14      Thus, based on the term's plain and ordinary meaning in the

15  context of the '479 patent, the Court construes "scheduling

16  content in a first language by storing content" as "scheduling

17  content in a first language for translation by storing that

18  content in a translation queue."

19          7.   "Retrieving the content in the first language from

20              the first Internet source"
            '216: 1, 27, 36

21      The term, "retrieving the content in the first language from

22  the first Internet source," describes one of a series of steps,

23  which are listed in each of the claims where the term appears.

24  The parties initially disputed whether these steps, in the

25  disclosed invention, must be performed in the order in which they

26  are listed in the patent.  They have since resolved this dispute,

27  however, by agreeing that certain steps must be performed in the

28  order in which they are listed.  Specifically, the parties now

**United States District Court**
For the Northern District of California

agree that the step of "receiving a first request from a user . . ." and the following step of "retrieving the content in the first language . . ." must precede the step of "receiving a second request from a user . . ." and the following step of "retrieving the content in the first language."  The Court adopts this construction in light of the parties' agreement.

II.  Summary Judgment

A.  Legal Standard

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation.  Nissan, 210 F.3d at 1105.  If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists.  Id.

**United States District Court**
For the Northern District of California

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id.  This is true even though the non-moving party bears the ultimate burden of persuasion at trial.  Id. at 1107.

B.   Transperfect's Motion for Summary Judgment

Transperfect moves for summary judgment that it has not infringed MotionPoint's patents.  It argues that, because human engineers play a vital role at the "parsing" stage of its translation process (i.e., when the website content is divided into translatable components), it cannot have infringed the MotionPoint patents, which disclose a fully automated, machine-based parsing process.

To support this assertion, Transperfect submits statements from MotionPoint's expert, Dr. Chase, whose invalidity report describes how MotionPoint's parsing process is fully automated and does not typically require human involvement.  See Lee Decl., Ex. 14, at ¶¶ 39-42.  Transperfect also cites statements from its own expert, Dr. Paul Clark, and one of its developers, Joseph Kuefler, describing how Transperfect relies heavily on human engineers to parse its clients' web content into translatable components.  See Lee Decl., Ex. 15, at ¶¶ 63, 200; Ex. 16, Kuefler Dep. 257:14-:22.

MotionPoint disputes Transperfect's characterization of its parsing process and asserts that much of Transperfect's parsing process is actually performed by web crawling software.  For support, it points to statements made by Kuefler, who, during his deposition, expressly stated that the dividing process was done by "[s]oftware, for the most part."  Declaration of Gregory C.

Wyckoff, Ex. 5, 78:14-79:1.  MotionPoint also cites excerpts from
Dr. Chase's expert report in which he explains how some of the
human engineers who participate in Transperfect's parsing process
are actually tasked with improving the automated elements of that
process -- not with parsing the content themselves.  <u>See</u> Wyckoff
Decl., Ex. 2, Chase Dep. 311:2-312:13.

Thus, MotionPoint has produced sufficient evidence to create
a genuine dispute of fact as to whether Transperfect's parsing
process involves significant automated elements that infringe
MotionPoint's patents.  Transperfect's summary judgment motion
must therefore be denied.

C.   MotionPoint's Cross-Motion for Summary Judgment

MotionPoint cross-moves for summary judgment that it has not
infringed Transperfect's patents.  It contends that its
translation system lacks key features of the translation
inventions disclosed in Transperfect's patents and, thus, does not
infringe those patents.

1.   '426 and '005 Patents

Transperfect alleges that MotionPoint's translation system
infringes the '426 and '005 patents by intermittently crawling its
clients' websites to check for changes in original-language
content.  MotionPoint does not dispute this characterization of
its crawling system but, rather, argues that the system does not
infringe because it differs in at least one respect from the
crawling system disclosed by Transperfect's patents.
Specifically, MotionPoint notes that Transperfect's patents
disclose a system that monitors its users' original-language
content <u>constantly</u> and detects changes in that content

United States District Court
For the Northern District of California

immediately.  In contrast, MotionPoint's own system only crawls its clients sites and detects content changes intermittently. Although Transperfect contends that its '426 and '005 patents disclose a system that monitors original-content intermittently, the Court specifically rejected this argument in construing the relevant patent terms.  Accordingly, Transperfect's evidence does not support an inference of infringement based on MotionPoint's crawling system.

Nor has Transperfect produced sufficient evidence to support a claim of infringement based on MotionPoint's system of notifying its clients about the status of their translation requests.  As noted above, the translation system disclosed by Transperfect's patents notifies the user -- that is, the manager of the original-language website -- when certain original-language content requires translation.  See '426 patent col. 52:34; '005 patent col. 53:43.  Although Transperfect asserts that MotionPoint's translation system provides its clients with similar notifications, the evidentiary record suggests otherwise. MotionPoint's expert, Dr. Paul Clark, asserts that MotionPoint's translation system does not notify MotionPoint's clients when content requires translation but, instead, only notifies MotionPoint's own employees and subcontractors.  See Wyckoff Decl., Ex. 9, at ¶ 53.  Although Transperfect has highlighted another section of Dr. Clark's report stating that MotionPoint's clients have access to the translation system, this is not the same as automatic notice because it requires clients to check for themselves whether any content requires translation.  Thus,

MotionPoint's notification system does not infringe Transperfect's patents.

Because Transperfect has failed to produce sufficient evidence to support an inference of infringement, MotionPoint is entitled to summary judgment of non-infringement of the '426 and '005 patents.

2.   '022 Patent

Transperfect alleges that MotionPoint infringes its '022 patent by providing a single-action translation option on its clients' websites.  For support, it provides several images of English-language websites maintained by MotionPoint's clients.  Wyckoff Decl., Ex. 11.  Each of these websites features links to non-English versions of these websites, images of which Transperfect has also provided.  Id.  Transperfect has also submitted internal MotionPoint documents that describe how website visitors are able to click on a link on a client's website in order to obtain a translation of that webpage.  Eisenberg Decl., Ex. 7, TransMotion Web Site Language Layering Technology: Integration Guide, at 8-9.  Taken together, these documents are sufficient to support a claim of infringement.  Although MotionPoint argues that these documents do not demonstrate that it actually infringes the '022 patent, they are still sufficient to raise material dispute of fact.  Accordingly, MotionPoint's motion for summary judgment of non-infringement must be denied with respect to the '022 patent.

CONCLUSION

For the reasons set forth above, the Court construes the disputed claim language in the manner explained; DENIES

United States District Court
For the Northern District of California

Transperfect's motion for summary judgment of non-infringement

(Docket No. 246); and GRANTS in part and DENIES in part

MotionPoint's cross-motion for summary judgment of non-

infringement (Docket No. 251).  The parties are directed to meet

with a private mediator within twenty-one days of this order.

    IT IS SO ORDERED.


Dated:  May 24, 2013

CLAUDIA WILKEN
United States District Judge

**United States District Court**
For the Northern District of California