1  DOUGLAS E. LUMISH (Bar No. 183863)
   doug.lumish@lw.com
2  JEFFREY G. HOMRIG (Bar No. 215890)
   jeff.homrig@lw.com
3  GABRIEL S. GROSS (Bar No. 254672)
   gabe.gross@lw.com
4  NIKOLAUS A. WOLOSZCZUK (Bar No. 286633)
   nick.woloszczuk@lw.com
5  LATHAM & WATKINS LLP
   140 Scott Drive
6  Menlo Park, California 94025
   Tel: (650) 328-4600; Fax: (650) 463-2600
7
   JOSEPH H. LEE (Bar No. 248046)
8  joseph.lee@lw.com
   LATHAM & WATKINS LLP
9  750 Town Center Drive, 20th Floor
   Costa Mesa, California 92626
10 Tel: (714) 540-1253; Fax: (714) 755-8290

11 *Attorneys for Plaintiffs/Counterclaim Defendants*
   *TransPerfect Global, Inc.; TransPerfect Translations*
12 *International, Inc.; and Translations.com, Inc.*

13

14                UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16                      OAKLAND DIVISION

17

18 TRANSPERFECT GLOBAL, INC.,          Case No. CV 10-02590 CW (DMR)
   TRANSPERFECT TRANSLATIONS IN-
19 TERNATIONAL, INC., AND               **TRANSPERFECT'S NOTICE OF MOTION**
   TRANSLATIONS.COM, INC.,              **AND MOTION FOR AN ORDER TO SHOW**
20                                      **CAUSE WHY MOTIONPOINT SHOULD**
              Plaintiffs/Counter-Defendants,  **NOT BE HELD IN CONTEMPT FOR VIO-**
21                                      **LATING THE PERMANENT INJUNCTION**
        v.                              **PROHIBITING INFRINGEMENT OF U.S.**
22                                      **PATENT NO. 6,857,022**

23 MOTIONPOINT CORPORATION,

              Defendant/Counterclaimant.  Date:    March 19, 2015
24                                         Time:    2:00 PM
                                           Judge:   Hon. Claudia Wilken
25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................................ iv

STATEMENT OF RELIEF REQUESTED ........................................................................... iv

ISSUE TO BE DECIDED ...................................................................................................... v

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 1

I.      INTRODUCTION ..................................................................................................... 1

II.     STATEMENT OF FACTS ........................................................................................ 1

        A.      The jury found that MotionPoint infringes the Scanlan patent. ................... 1

        B.      The Court permanently enjoined MotionPoint from infringing the
                Scanlan patent. ............................................................................................. 3

        C.      The Court of Appeals refused to stay the injunction and it became
                effective on January 12, 2015. ..................................................................... 4

        D.      MotionPoint continues infringing the Scanlan patent. ................................ 4

        E.      Contempt proceedings are needed to force MotionPoint to comply
                with the Court's injunction. ......................................................................... 5

III.    LEGAL STANDARDS ............................................................................................. 6

IV.     MOTIONPOINT IS VIOLATING THE INJUNCTION. ......................................... 7

        A.      MotionPoint continues to use the same proxy server-based
                architecture for TransMotion that was shown to the jury at trial. .............. 7

        B.      MotionPoint has not made any changes to the TransMotion system
                it provides to many of its customers and it continues to infringe. ............ 11

        C.      MotionPoint's attempt to design around the Scanlan patent for
                other customers does not and cannot stop the infringement. ..................... 15

                1.      MotionPoint's attempted design-around is based on the
                        false premise that JavaScript is always in use. ............................. 15

                2.      The Best Buy website confirms that MotionPoint's
                        attempted design-around does not stop its ongoing
                        infringement. .................................................................................. 16

V.      MOTIONPOINT SHOULD BE HELD IN CONTEMPT AND
        TRANSPERFECT FAIRLY COMPENSATED. ..................................................... 22

VI.     CONCLUSION ....................................................................................................... 25

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

**CASES**

4

*Amado v. Microsoft Corp.*,

5

   517 F.3d 1353 (Fed. Cir. 2008)...................................................................................24

6

*Assoc'd Gen. Contractors v. S.F. Unified School Dist.*,

   544 F. Supp. 845 (N.D. Cal. 1982) ..........................................................................25

7

8

*Bose Corp. v. Linear Design Labs, Inc.*,

   No. 71 Civ. 3103, 1978 U.S. Dist. LEXIS 16195 (S.D.N.Y. Mar. 1, 1978)...........25

9

*Brine, Inc. v. STX L.L.C.*,

10

   367 F. Supp. 2d 61 (D. Mass. 2005) ...................................................................24, 25

11

*Cal. Artificial Stone Paving Co. v. Molitor*,

   113 U.S. 609 (1885).................................................................................................22

12

*Citizens for a Better Environment v. Wilson*,

13

   775 F. Supp. 1291 (N.D. Cal. 1991) .....................................................................6, 14

14

*In re Crystal Palace Gambling Hall, Inc.*,

15

   817 F.2d 1361 (9th Cir. 1987) ...................................................................................6

16

*Embrex, Inc .v. Service Eng'g Corp.*,

   216 F.3d 1343 (Fed. Cir. 2000)................................................................................16

17

*ePlus Inc. v. Lawson Software, Inc.*,

18

   946 F. Supp. 2d 472 (E.D. Va. 2013) ......................................................................24

19

*FTC v. EDebitPay, LLC*,

20

   695 F.3d 938 (9th Cir. 2012) ...................................................................................23

21

*Hubbard/Downing, Inc. v. Kevin Heath Enters.*,

   No. 1:10-cv-1131-WSD, 2014 U.S. Dist. LEXIS 764 (N.D. Ga. Jan. 6, 2014) ...............24, 25

22

*Leman v. Krentler-Arnold Hinge Last Co.*,

23

   284 U.S. 448 (1932)..................................................................................................24

24

*Levi Strauss & Co. v. Papikian Enters.*,

   No. C 10-05051 JSW, 2012 U.S. Dist. LEXIS 112938 (N.D. Cal. Aug. 10,

25

   2012) .........................................................................................................................25

26

*McComb v. Jacksonville Paper Co.*,

27

   336 U.S. 187 (1949)...................................................................................................6

28

ii

*Merial Ltd. v. Cipla Ltd.*,
    681 F.3d 1283 (Fed. Cir. 2012)...................................................................24

*Nken v. Holder*,
    556 U.S. 418 (2009)...................................................................................6

*NLRB v. Ironworkers Local 433*,
    169 F.3d 1217 (9th Cir. 1999) ....................................................................6

*Perry v. O'Donnell*,
    759 F.2d 702 (9th Cir. 1985) .....................................................................25

*Reebok Int'l v. McLaughlin*,
    49 F.3d 1387 (9th Cir. 1995) .....................................................................6

*Stryker Corp. v. Davol Inc.*,
    234 F.3d 1252 (Fed. Cir. 2000)..................................................................25

*Sunearth, Inc. v. Sun Earth Solar Power Co., Ltd.*,
    No. C 11-4991 CW, 2013 U.S. Dist. LEXIS 120409 (N.D. Cal. Aug. 23,
    2013) .......................................................................................................24

*In re TFT-LCD Flat Panel Antitrust Litig.*,
    289 F.R.D. 548 (N.D. Cal. 2013) ...............................................................25

*TiVo Inc. v. Echostar Corp.*,
    646 F.3d 869 (Fed. Cir. 2011)........................................................6, 7, 14, 22

*United States v. Ayers*,
    166 F.3d 991 (9th Cir. 1999) ......................................................................7

*Upjohn Co. v. Medtron Labs., Inc.*,
    894 F. Supp. 126 (S.D.N.Y. 1995)..............................................................25

*Whittaker Corp. v. Execuair Corp.*,
    953 F.2d 510 (9th Cir. 1992) .....................................................................23

iii

1

## NOTICE OF MOTION AND MOTION

2          PLEASE TAKE NOTICE that on March 19, 2015 at 2:00 p.m. or as soon thereafter as

3   the matter may be heard, in the courtroom of the Honorable Claudia Wilken at the United States

4   District Court for the Northern District of California, Oakland Division, located at 1301 Clay

5   Street, Oakland, California 94612, plaintiffs TransPerfect Global, Inc., TransPerfect Translations

6   International, Inc., and Translations.com, Inc. (collectively "TransPerfect") will and hereby do

7   move the Court for an order that defendant MotionPoint Corporation ("MotionPoint") show

8   cause why it should not be held in contempt for its continuing violation of the Court's permanent

9   injunction. This motion is based on this Notice of Motion and Motion; the supporting Memoran-

10  dum of Points and Authorities; the Court's First Amended Permanent Injunction (Dkt. 543); the

11  Court's First Amended Judgment (Dkt. 545); and any additional evidence or argument received

12  by the Court.

13

## STATEMENT OF RELIEF REQUESTED

14          TransPerfect respectfully requests that the Court issue an order directing MotionPoint to

15  show cause why it should not be held in contempt for violating the Court's permanent injunction

16  prohibiting infringement of TransPerfect's U.S. Patent No. 6,857,022, as well as an order

17  (1) holding MotionPoint in contempt; (2) requiring it give all customers written notice of the

18  permanent injunction and the Court's finding of contempt; (3) ordering that in any further at-

19  tempts to redesign its technology to avoid the Scanlan patent, MotionPoint shall not rely on any

20  optional technology that can be disabled by a user, and instead shall implement permanent

21  changes designed to ensure no further infringement; (4) ordering an accounting and disgorge-

22  ment of MotionPoint's gross profits on all infringing sales made in violation of the injunction

23  starting January 12, 2015 until the day that MotionPoint stops all of its infringement and certifies

24  to TransPerfect and the Court with satisfactory evidence that it has done so; and (6) award

25  TransPerfect its costs and attorneys' fees incurred in connection with all proceedings to enforce

26  the injunction.

27

28

iv

1

## ISSUE TO BE DECIDED

2       Whether, in view of MotionPoint's multiple, repeated failures to stop using its infringing

3 technology on or after January 12, 2015, when the Court's permanent injunction prohibiting in-

4 fringement of TransPerfect's U.S. Patent No. 6,857,022 became effective, and in view of Mo-

5 tionPoint's reliance in other instances on an optional, insignificant "design-around" that (a) is not

6 even available to every user and (b) does not and cannot stop the infringement, the Court should

7 issue an order directing MotionPoint to show cause why it should not be held in contempt, and

8 further issue an order finding MotionPoint in contempt.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    <u>INTRODUCTION</u>**

3              MotionPoint has long disregarded the rights of its competitor, TransPerfect, and shown

4    no regard for its patents. In 2013, this led to a jury verdict that MotionPoint infringed TransPer-

5    fect's patent on a foundational technology in the field of proxy-based website translation, and to

6    the Court issuing a permanent injunction barring any further infringement. MotionPoint had

7    more than a year to prepare for this injunction, which went into effect on January 12, 2015. But

8    today, MotionPoint is openly violating the injunction and disregarding this Court's judgment.

9              Despite the injunction, MotionPoint has continued to provide its customers with the same

10   systems and methods the jury found to infringe at trial. These repeated failures to comply with

11   the injunction—after over a year to prepare—are, on their own, contempt of Court. And in still

12   other instances, MotionPoint has implemented a cosmetic and insignificant change that does not

13   come close to avoiding infringement. MotionPoint's attempt at a "design-around" is based on the

14   addition of some JavaScript code to create a "pop-up" screen that easily can be disabled by a us-

15   er.  As MotionPoint knows, running JavaScript is an optional feature that is never required. Rely-

16   ing on JavaScript for a "design-around" only ensures that it will not work for, or even be availa-

17   ble to, anyone who does not use JavaScript, and permits continued infringement. Indeed, disa-

18   bling JavaScript, as any user can do, reveals that MotionPoint still is using the same infringing

19   systems shown at trial, even if it now tries to conceal or obscure them with "pop-ups." Even with

20   JavaScript running, MotionPoint's so-called "design-around" only adds unclaimed features and

21   does not eliminate or modify any of the infringing functionalities shown at trial. This too is a

22   contemptuous violation of the injunction.

23             Enough is enough. The Court should order MotionPoint to show cause for why it should

24   not be held in contempt for its continuing infringement and repeated, ongoing violations of the

25   injunction. MotionPoint cannot make such a showing, and the Court should hold it in contempt.

26   **II.   <u>STATEMENT OF FACTS</u>**

27             **A.    The jury found that MotionPoint infringes the Scanlan patent.**

28             After a two-week trial, on July 12, 2013 the jury returned its verdict that MotionPoint in-

1

fringes six valid claims of TransPerfect's U.S. Patent No. 6,857,022. The "Scanlan patent," as it has been referred to in reference to inventor and witness Philip Scanlan, describes and claims systems and methods for ordering translations of electronic communications such as web pages using proxy server-based technologies. MotionPoint and TransPerfect are close competitors in the business of providing website translation products and services, including using proxy servers to supply their customers with translated versions of websites.

At trial, much of the evidence about infringement focused on MotionPoint's "TransMotion" system using a "single action translation component," and employing the concept of "implicit navigation." Implicit navigation refers to the idea that, in translating an original-language web page into a second language, the hyperlinks in the original page are rewritten so they point to translations of the linked pages in the second language. Both concepts are described and included in the claims of the Scanlan patent. As the Court noted in issuing the injunction, "the 'implicit navigation' and 'single-action translation' features of the TransMotion system -- the allegedly infringing components -- were *integral parts* of the system" and without implicit navigation, "the TransMotion system would be '*impossible to use*.'" (Dkt. 544 at 14-15.[1])

Claim 17 is representative of the claims MotionPoint was found to infringe at trial:

17. A single-action translation ordering system comprising:

[a] a single action translation component displayed simultaneously with at least part of an electronic communication comprising at least text of more than one word and one or more hyperlinks to further electronic communications, said translation component comprising an object identified as effecting a translation of said electronic communication in a single action;

[b] a communication network; and

[c] a translation manager in communication with said single action translation component via said communication network;

[d] said translation manager:

obtaining a translation of said electronic communication in response to a user clicking said single action translation component;

directing transmission of said translation of said electronic communication to said user; and

---

[1] Unless otherwise specified, all emphasis within quotes has been supplied.

2

1    [e] providing translation of said further electronic communications when said
2        hyperlink is activated:

3        by delivering a translation of said further electronic communications that
           was translated when said electronic communication was translated; or

4        by obtaining a translation of said further electronic communications when
           said hyperlink is activated.

6    To prove infringement of this claim and five others with similar limitations, TransPerfect

7 presented evidence through a number of witnesses including computer science expert Dr. Paul

8 Clark. Two of the most prominent examples of MotionPoint's infringement discussed at trial

9 were the use of its proxy-based technology to power the translation-related features of websites

10 for its then-customers Best Buy and La Quinta. At trial, Dr. Clark testified about how the Best

11 Buy and La Quinta websites evidenced MotionPoint's infringement of claim 17 and others, and

12 the jury agreed. (Clark Decl., Section V.)

13    **B.**    **The Court permanently enjoined MotionPoint from infringing the**
14            **Scanlan patent.**

15    On November 15, 2013, the Court issued the permanent injunction but stayed its effec-

16 tiveness until it resolved the parties' post-judgment motions. (Dkt. 467, 468.) In those subse-

17 quent proceedings, MotionPoint downplayed the significance of the Scanlan patent, claiming that

18 "there is not a shred of evidence suggesting that MotionPoint would have lost a single . . . cus-

19 tomer if it did not employ the Scanlan technology," and it argued that there was no evidence that

20 MotionPoint's use of the patented technology was "even a factor in . . . a single MotionPoint cus-

21 tomer's decision to use TransMotion®." (Dkt. 486 at 12, 15.) Despite claiming that it did not

22 need Scanlan's patented technology to compete in the business of proxy-based website transla-

23 tion (Dkt. 447 at 9, n.3), MotionPoint urged the Court to postpone the injunction. Counsel repre-

24 sented that a reason MotionPoint wanted to stay the injunction was to "permit the parties time to

25 engage in a dialogue about design-around that we could involve Your Honor in." (Gross Decl.

26 Exh. A (2/6/2014 Hrg. Tr.) at 8:9-10.) MotionPoint got a lengthy stay, but no such dialogue ever

27 occurred.

28    On November 13, 2014, the Court resolved the remaining post-judgment motions. It up-

3

TRANSPERFECT'S MOTION FOR AN ORDER TO SHOW CAUSE
WHY MOTIONPOINT SHOULD NOT BE HELD IN CONTEMPT
CASE NO. CV 10-02590 CW (DMR)

1    held the validity of the Scanlan patent and the infringement verdict. (Dkt. 544.) It amended and

2    broadened the permanent injunction. (Dkt. 543, 544.) At MotionPoint's request, the Court de-

3    layed the effective date of the injunction until January 12, 2015 to give MotionPoint another op-

4    portunity to seek a stay, this time from the Federal Circuit pending appeal. (Dkt. 551.)

5        **C.   The Court of Appeals refused to stay the injunction and it
              became effective on January 12, 2015.**

6

7        MotionPoint argued to the Federal Circuit that another stay was necessary because this

8    Court's decision to enjoin it purportedly was "based on several fundamental—and independ-

9    ent—legal errors," based on "clear errors of fact", and that "MotionPoint has a strong likelihood

10   of success on appeal." (Gross Decl., Exh. B at 2, 3, 7.) The Federal Circuit denied the motion.

11   (*Id.*, Exh. C.) On January 12, 2015 the permanent injunction finally went into effect.

12       **D.   MotionPoint continues infringing the Scanlan patent.**

13       Despite MotionPoint having had more than a year since the Court first granted the injunc-

14   tion to decide how to stop infringing and make the necessary changes, and despite counsel's rep-

15   resentation that it could use that time to "engage in a dialogue about design-around that we could

16   involve your Honor in," MotionPoint never once communicated with TransPerfect (much less

17   the Court) before the injunction became effective about how it would design around the Scanlan

18   patent. Shortly after the Federal Circuit declined to stay the injunction but before it went into ef-

19   fect on January 12, in a call between counsel MotionPoint would not or could not explain how it

20   planned to comply with the injunction, only that it would vary depending on the website. Since

21   then, it has become entirely clear that MotionPoint was not prepared to stop, did not stop, and

22   does not plan to stop infringing—and the evidence is overwhelming.

23       First, in many instances since the injunction became effective, MotionPoint simply has

24   continued infringing in the same manner it has been doing for years, using the same TransMotion

25   system the jury found to infringe, with no changes to the infringing features. This is a pattern, not

26   an isolated incident or two. Dr. Clark describes *eight examples* of this post-injunction infringe-

27   ment that can be seen on the websites of its customers, like Plexus, Ford, Simply Healthcare, and

28   others. (Clark Decl., ¶ 18, Section VI.)

4

Second, for some of its other customers MotionPoint has attempted to "design around" the Scanlan patent by adding some JavaScript code to create a "pop-up" or "overlay" that partially obscures or conceals, rather than stops, its infringement. This attempted "design-around" is based on JavaScript, and as Dr. Clark explains, JavaScript is *not* always run or executed, and is easily disabled by a user or a user's network. Thus, an attempt at a "design-around" based on JavaScript will not be effective or even available to all users, permitting ongoing infringement. In this case, *disabling* JavaScript while visiting the website of a MotionPoint customer such as Best Buy—as many Internet users do—reveals and confirms that MotionPoint still is using *the same systems and methods found to infringe at trial*. Even with JavaScript enabled, the attempted "design-around" effects a merely colorable change. MotionPoint's so-called "design-around" adds unclaimed steps or features and does not eliminate or modify the functionalities TransPerfect relied on to prove infringement at trial. MotionPoint continues to infringe the Scanlan patent.

When TransPerfect confronted MotionPoint with its violation of the injunction, Motion-Point denied it, claiming that "[p]rior to January 12, 2015, MotionPoint modified its TransMotion® system" to avoid infringing. (Gross Decl., Exhs. D, E.) This is plainly false, which is clear from the many examples of MotionPoint's customers *after* January 12 still using MotionPoint's infringing TransMotion product. (Clark Decl., Section VI; *infra* Section IV.B.) But even if MotionPoint had made its "modifications" before January 12, they add nothing more than unclaimed features and simply follow the examples described in the Scanlan patent.

MotionPoint's primary justification for its conduct—that it "no longer includes a 'single action translation component'" because it has caused "one or more intermediate screens to be displayed"—is specious. (Gross Decl., Exh. E.) As MotionPoint knows, its "intermediate" JavaScript "pop-ups" will not be available to all users and even if they were, the Scanlan patent teaches examples of its invention in which such "intermediate" steps occur before a user accesses the single action translation component.

### E. Contempt proceedings are needed to force MotionPoint to comply with the Court's injunction.

MotionPoint's unabated infringement is a violation of the injunction, a gross disregard

5

1  for TransPerfect's patent rights, and an affront to the Court's authority. MotionPoint continues to

2  profit from a business model based entirely on infringing TransPerfect's patent. The verdict had

3  no deterrent effect, nor did the damages award, the Court's judgment, the injunction, or the Fed-

4  eral Circuit's decision. To stop MotionPoint's unlawful infringement and ensure the integrity of

5  the Court's orders, TransPerfect is left with no choice but to initiate these contempt proceedings.

6  **III.**    **LEGAL STANDARDS**

7       The Court issues injunctions "with the backing of its full coercive powers." *Nken v.*

8  *Holder*, 556 U.S. 418, 428 (2009). "District courts do, and must, have the authority to punish

9  contemptuous violations of their orders." *Reebok Int'l v. McLaughlin*, 49 F.3d 1387, 1390 (9th

10  Cir. 1995). A party that "fails to take all the reasonable steps within [its] power to insure compli-

11  ance" with a specific and definite order "may properly be adjudged in contempt." *In re Crystal*

12  *Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987) (internal quotations omitted).

13  A party's purported good faith intentions are *immaterial*—"[a]n act does not cease to be a viola-

14  tion of a law and of a decree merely because it may have been done innocently." *NLRB v. Iron-*

15  *workers Local 433*, 169 F.3d 1217, 1222 (9th Cir. 1999) (quoting *McComb v. Jacksonville Paper*

16  *Co.*, 336 U.S. 187, 191 (1949)); *Citizens for a Better Environment v. Wilson*, 775 F. Supp. 1291,

17  1299-1300 (N.D. Cal. 1991) ("[T]he only issue is whether the party could have complied . . . .").

18       Whether or not an adjudged patent infringer's actions violate an injunction prohibiting

19  further infringement is a matter of Federal Circuit law. *TiVo Inc. v. Echostar Corp.*, 646 F.3d

20  869, 881 (Fed. Cir. 2011). The initial burden is on the moving party to prove by clear and con-

21  vincing evidence that first, "the newly accused product is not more than colorably different from

22  the product found to infringe" and second, "that the newly accused product actually infringes."

23  *Id.* at 882-83. The focus must be "on those aspects of the accused product that were previously

24  alleged to be, and were a basis for the prior finding of infringement, and the modified features of

25  the newly accused product," if any, and not on "differences between randomly chosen features of

26  the product found to infringe . . . and the newly accused product." *Id.* at 882. A newly accused

27  product is only more than colorably different if the infringer *significantly* modified or removed

28  one or more elements that provided the underlying basis for infringement. *Id.* at 882.

6

1    Even when such elements have been modified or removed, a newly accused product will

2    only be found to be more than colorably different if the changes are "significant" given "the na-

3    ture of the products at issue." *Id*. In determining whether a change is significant, the "court must

4    also look to the relevant prior art, if any is available, to determine if the modification merely em-

5    ploys or combines elements already known in the prior art in a manner that would have been ob-

6    vious to a person of ordinary skill in the art at the time the modification was made." *Id.* In other

7    words, "the innovative significance of the modification is best viewed in light of the existing art

8    and from the perspective of one of ordinary skill in the art." *Id.* at 883, n.1.

9    If there are either no differences or no more than merely colorable differences between

10   the adjudged infringing product and the newly accused product, a finding that the newly accused

11   product meets each limitation of the claims is the final step to find a violation of the injunction.

12   *Id*. at 883. The burden then shifts to the infringer "to produce evidence explaining his noncom-

13   pliance." *United States v. Ayers*, 166 F.3d 991, 994 (9th Cir. 1999) (internal quotations omitted).

14   **IV.    MOTIONPOINT IS VIOLATING THE INJUNCTION.**

15   The Court enjoined "MotionPoint Corporation and its officers, agents, servants, employ-

16   ees, successors, and assigns, and those knowingly acting in concert with them with notice of this

17   injunction, *from making, using, offering for sale, or selling in or importing into the United States*

18   *any product that infringes*, directly or indirectly, claims 11, 17, 23, 24, 26 and 27 of U.S. Patent

19   No. 6,857,022." (Dkt. 543 at 1.) Yet MotionPoint continues to employ the same systems and

20   methods that the jury found to be infringing in July 2013, and also has made cosmetic, insignifi-

21   cant changes that are no more than colorably different from the technology the jury found to in-

22   fringe. Because the evidence is clear and convincing that MotionPoint's technology today is no

23   different, or is merely colorably different, than the technology found to infringe at trial and that it

24   continues to infringe the Scanlan patent, a contempt finding is in order.

25   **A.    MotionPoint continues to use the same proxy server-based architecture
         for TransMotion that was shown to the jury at trial.**

26

27   TransPerfect and MotionPoint are close competitors, and both use proxy server-based

28   technology to power their customers' translated websites. (Clark Decl., ¶ 20.) As an example, a

7

MotionPoint customer such as Best Buy may host a website in English on its own web server, while MotionPoint will translate that website into Spanish and host translated versions of it on a separate proxy server. (*Id.*) A visitor can choose to view the site in Spanish, and if she does, a MotionPoint proxy server or "translation manager" will serve up the translated version of the website. (*Id.*) This three-point flow of information among the Internet



user, the web server, and the proxy server, was discussed at length at trial. (*Id.*, ¶¶ 21-22.) The image at the top right of this page is an annotated version of Figure 1 from the Scanlan patent depicting the proxy concept, which Dr. Clark presented to the jury on June 26, 2013. The Internet user is labeled with a yellow dot, the web server with a green dot, and the proxy server or "translation manager" with a red dot. (Clark Decl., ¶ 21; *see also* Trial Tr.[2] at 399-400.)

MotionPoint's "TransMotion" system, which the jury found to infringe at trial, uses the same proxy server-based approach. (Clark Decl., ¶¶ 21-22; Gross Decl., Exh. G (PTX 6024).) Dr. Clark explained this at trial, with an annotated version of MotionPoint's own internal document that refers to the Internet user as a "public user" (yellow dot), the customer's web server as the "Client/Web Server" (green dot), and the translation



_____

[2] All cited excerpts from the trial transcript and deposition transcripts played at trial are included as Exhibit F to the supporting declaration of Gabriel S. Gross.

8

1    manager or proxy server "TransMotion Server" or "Translation Server" (red dot), as shown in

2    the image at the bottom of the previous page. (Clark Decl., ¶ 22; Trial Tr. at 400-01.)

3          MotionPoint continues using the same architecture today. (Clark Decl., ¶¶ 23-25.) The

4    annotated image below, taken from a video on MotionPoint's website, depicts the same three-

5    point flow of information in TransMotion today. (*Id.*, ¶ 24.) MotionPoint's CTO Enrique Tra-

6    vieso depicts the Internet user with a stick figure (yellow dot added), the customer's web server

7    as "Client Web Site" (green dot added) and the translation manager or proxy server as the "Mo-

8    tionPoint TransMotion Server" (red dot added):

9

10

11

12                

13

14

15

16

17

18

19

20

21   (*Id.*, ¶ 24; *see also* www.motionpoint.com/our-technology/, "Watch *How it works*" video (last

22   visited Jan. 19, 2015).) This is consistent with Mr. Travieso's testimony in 2013 that Motion-

23   Point was using the same "proxy-based solution." (Trial Tr. at 813:19-814:6.)

24         At trial, Dr. Clark walked the jury through the specific evidence of infringement, discuss-

25   ing the "TransMotion" technology MotionPoint had deployed for its then-customers La Quinta

26   and Best Buy. (Clark Decl., Section V, ¶¶ 29-34; *see also* Trial Tr. at 389-515; Gross Decl. Exh.

27   J (PTX 5686), Exh. L (PTX 5707).) In brief, and as explained in more detail by Dr. Clark,

28   TransPerfect showed the jury how MotionPoint's systems satisfied all limitations of claim 17

                                                    9

1   and five other claims, with which the jury agreed.

2          For example, the "Español" link on the Best Buy home page was among the evidence

3   TransPerfect relied on to demonstrate that MotionPoint satisfied element [a] of claim 17, relating

4   to the single action translation component. (Clark Decl., ¶¶ 30-31; Trial Tr. at 407-09, 440-41;

5   Gross Decl. Exh. J; *see also* Exh. L.) TransPerfect presented evidence of how MotionPoint also

6   satisfied elements [b] and [c], requiring a "communication network," the Internet, in communica-

7   tion with a "translation manager," or proxy server. (Clark Decl., ¶ 32; Trial Tr. at 441-44; Gross

8   Decl. Exh. H (PTX 5259-0004); Dep. of C. Pretelt at 125:5-18, 22-25, played at trial on June 26,

9   2013.) And TransPerfect, through witnesses including Dr. Clark, presented testimony on how

10  MotionPoint met element [d], regarding the translation manager "obtaining a translation" in re-

11  sponse to clicking the single action translation component and "directing transmission" of the

12  translation to the user. (Clark Decl., ¶ 33; *see also* Trial Tr. at 427-30, 444-45; Gross Decl. Exh. I

13  (PTX 5801-0007), Exhs. J, L; Dep. of A. Andrade at 131:16-132:1, played at trial on June 26,

14  2013.) TransPerfect presented the jury with evidence that MotionPoint used implicit navigation,

15  satisfying the final element [e] in representative claim 17, showing that once a translated page

16  was obtained, MotionPoint provided translations of "further electronic communications" linked

17  within the translation. (Clark Decl., ¶ 34; Gross Decl., Exhs. J, L; Trial Tr. at 445-446.)

18         TransPerfect showed the jury Best Buy's website, which had a single action translation

19  component ("Español") that could be used to obtain a translated web page and infringe the Scan-

20  lan patent. For example, Dr. Clark testified about the following images of the Best Buy site, cap-

21  tured before and after the "Español" single action translation component was clicked:

22

23

24

25

26

27

28

                                          10



(Clark Decl., ¶¶ 31-33; *see also* Gross Decl. Exh. J (PTX 5686); Trial Tr. at 407-09.) The jury agreed with Dr. Clark's opinions that MotionPoint's TransMotion system directly infringed the Scanlan patent, and returned a verdict that claims 11, 17, 23, 24, 26, and 27 were infringed. (Clark Decl., ¶ 29.)

### B.   MotionPoint has not made any changes to the TransMotion system it provides to many of its customers and it continues to infringe.

Contrary to counsel's representation that "*prior* to January 12, 2015," MotionPoint had "modified its TransMotion® system," the evidence is clear, specific, and numerous that *after* that

11

1    date, MotionPoint has continued using the same TransMotion system that was found to infringe

2    at trial. In his declaration, which TransPerfect incorporates herein by reference, Dr. Clark ex-

3    plains in detail *eight* representative examples of MotionPoint, after January 12, deploying the

4    same technology found to infringe at trial for customers like Simply Healthcare, Ford, and Ty-

5    lenol, to name just a few. (Clark Decl., Section VI.) As Dr. Clark explains, these examples of

6    MotionPoint's present-day technology are not functionally different from the technology found

7    to infringe at trial, and this present-day version continues to infringe. (*Id*.)

8        One example suffices here. After January 12, MotionPoint has used its TransMotion sys-

9    tem for its customer Simply Healthcare in the same way it was using it in 2013 for Best Buy and

10   La Quinta, whose websites evidenced infringement at trial. As of January 23, MotionPoint was

11   using its TransMotion technology to power Simply Healthcare's website. The site at

12   http://www.simplyhealthcareplans.com/medicare (last visited Jan. 23, 2015) confirms the use of

13   a single action translation component ("Español"), displayed at the top of the page. (Clark Decl.,

14   ¶¶ 78-79.) As Dr. Clark explains, this satisfies element [a] of claim 17. (*Id.*)



1  MotionPoint's TransMotion system in this example also uses a communication network,

2  the Internet, satisfying element [b] of claim 17. (*Id.*, ¶ 80.) And when a user clicks the single ac-

3  tion translation component, the following translated page immediately appears in Spanish, served

4  from the address http://espanol.simplyhealthcareplans.com/medicare (last visited Jan. 23, 2015):



19  (Clark Decl., ¶ 81.)

20  In response to the user clicking the single action translation component, the translation

21  manager, or "MotionPoint's TransMotion Server," obtains the translation and directs it to the

22  user over the Internet from http://espanol.simplyhealthcareplans.com/medicare. This satisfies

23  elements [c] and [d] of claim 17. (Clark Decl., ¶ 82.) The translation, like the original English

24  page, has hyperlinks to additional webpages on it. When a user clicks on such a link, for example

25  the "NOSOTROS" ("About us") link on the page above, the translation manager in Motion-

26  Point's system provides a translation of this further electronic communication, which is the fea-

27  ture referred to as implicit navigation. This feature satisfies element [e] of claim 17. (*Id.*, ¶ 83.)

28  This present-day example of MotionPoint's technology is functionally unchanged since

13

1  trial. As Dr. Clark explains, "The functionalities are the same, for example, as those demonstrat-

2  ed through the Best Buy and La Quinta websites, which I testified about and explained to the ju-

3  ry at trial." (Clark Decl., ¶ 84.) If there are any relevant differences, they are merely colorable

4  and insignificant, and do not affect the functionalities of TransMotion that the jury found to in-

5  fringe the Scanlan patent. (*Id.*, ¶ 85.) Because MotionPoint satisfies every claim element of rep-

6  resentative claim 17, as exemplified by the TransMotion system it deploys for Simply

7  Healthcare, MotionPoint continues to infringe claim 17 just as at trial. (*Id.*, ¶¶ 18, 77-86.)

8      Simply Healthcare's website is hardly the only example of MotionPoint's continued use

9  of the same infringing technology after the injunction went into effect. After January 12, 2015,

10  the TransMotion systems MotionPoint deployed for many of its other customers' websites

11  worked the same way. These include the websites for customers such as Plexus, Integral Quality

12  Care, Ford, American Heart Association, Seminole Casino, CoventryOne, and Tylenol. (Clark

13  Decl., Section VI.A.-H.) There is no observable difference, not even a colorable one, between

14  the TransMotion systems used to power these customers' websites after January 12, 2015 and the

15  TransMotion system found to infringe at trial. (*Id.*) These systems continue to use a single action

16  translation component to effect translations, and include the implicit navigation feature, among

17  all the other elements of representative claim 17, and thus continue infringing the Scanlan patent.

18  (*Id.*) MotionPoint's representation that "[p]rior to January 12, 2015, MotionPoint modified its

19  TransMotion® system" is belied by this clear evidence.

20      Because (1) MotionPoint's systems described above are unchanged, or at least are not

21  more than colorably different from the TransMotion system found to infringe at trial, and

22  (2) because these TransMotion systems continue infringing the Scanlan patent, MotionPoint's

23  actions violate the injunction. *TiVo*, 646 F.3d at 882-83. This alone is grounds for contempt.

24      Whether it acted deliberately or not, and whether MotionPoint has since remedied the in-

25  fringements described above or not, MotionPoint cannot avoid the consequences of failing to

26  comply with the injunction—especially having had over a year to plan for it. It does not matter

27  whether the violation was willful because good faith is not a defense. "Rather, the only issue is

28  whether the party could have complied (or took all reasonable steps within its power to com-

14

1   ply).” *Citizens*, 775 F. Supp. at 1300. MotionPoint plainly did not take all reasonable steps to

2   comply with the injunction, as these examples make clear. If over the past year, it had even the

3   slightest doubt about its ability to comply with this Court’s injunction, the reasonable thing to do

4   would have been, at a minimum, to advise TransPerfect or the Court of any possible reasons for

5   non-compliance or, more sensibly, to simply stop providing its customers with any of the prod-

6   ucts or services in question. MotionPoint did neither and now is in contempt.

7       **C.    MotionPoint’s attempt to design around the Scanlan patent for other cus-
            tomers does not and cannot stop the infringement.**

8

9       For other customers, MotionPoint has attempted to design around the Scanlan patent by

10  adding some JavaScript code to its technology.  When executed, this additional JavaScript code

11  gives the *appearance* of adding a step—the “pop-up” display of an intermediate JavaScript

12  screen or “overlay”—between when a user clicks a link on a customer’s website and when Mo-

13  tionPoint presents a complete, unobscured, and unobstructed version of the translated website.

14  (Clark Decl., ¶ 117.) This is what counsel was referring to in claiming that MotionPoint “no

15  longer includes a ‘single action translation component’ as claimed,” because now “multiple ac-

16  tions are required to initiate a translation.” (Gross Decl. Exh. D) MotionPoint knows better.  A

17  JavaScript-based design-around, even if it succeeded in avoiding the Scanlan patent (and this one

18  does not) cannot be effective because running JavaScript is never required, ensuring ongoing in-

19  fringement. (Clark Decl., ¶ 118.) When the infringing websites are viewed with a browser that

20  does not employ JavaScript, MotionPoint’s “pop-ups” disappear and its infringing systems and

21  methods are exposed for what they are, no longer obscured and concealed by JavaScript effects.

22  (*Id.*) And even with JavaScript enabled, MotionPoint’s attempted design-around is no more than

23  colorably different from the version of TransMotion shown at trial and MotionPoint continues to

24  infringe.  (*Id.*)

25              **1.    MotionPoint’s attempted design-around is based on the false
                    premise that JavaScript is always in use.**

26

27      JavaScript, the dynamic computer programming language that MotionPoint is relying on

28  to implement its attempted design-around, is not run on all computers, or by all users, or on all

15

1   networks. (Clark Decl., ¶¶ 119-20.) Moreover, common web browsers, such as Microsoft's In-

2   ternet Explorer, Google's Chrome, and Apple's Safari, have standard settings that permit users to

3   enable or disable JavaScript, depending on their preferences. (*Id.*, ¶¶ 120-25.) A user may, and

4   many do, choose not to use JavaScript for any number of reasons relating to privacy, security, or

5   to simply avoid unwanted advertisements while browsing the web. (*Id.*) By relying on the addi-

6   tion of JavaScript code, MotionPoint has ensured that its design-around will not work for, or

7   even be available to, any user or network that does not use JavaScript. (*Id.*, ¶ 126.) Thus, even if

8   it were effective at avoiding the claims of the Scanlan patent (and it is not), such a design-around

9   can never be executed when JavaScript is not employed, and will permit continuing infringe-

10  ment. (*Id.*)[3]

11              **2.    The Best Buy website confirms that MotionPoint's attempted design-
                        around does not stop its ongoing infringement.**

12

13          MotionPoint's implementation of its technology for Best Buy today demonstrates that its

14  attempted design-around is no more than a minor tweak to the systems TransPerfect relied on to

15  prove infringement at trial, and that it continues to infringe. (Clark Decl., ¶ 127.) When using a

16  web browser that is not enabled for JavaScript, as Dr. Clark did, it becomes immediately appar-

17  ent that MotionPoint continues using the same infringing TransMotion system found to infringe

18  at trial. (*Id.*) Importantly, disabling JavaScript on a browser in no way affects MotionPoint's

19  technology; whether a user browsing the web has enabled it or not, MotionPoint's systems re-

20  main the same and are still in use. (*Id.*, ¶ 129.) Thus, disabling JavaScript provides a view into

21  how the non-JavaScript-powered portions of MotionPoint's technology are actually working.

22  (*Id.*, ¶ 128.)

23  _____

24  [3] MotionPoint may try to argue that its design-around is sufficient, or effective "enough," be-
    cause only a small proportion of users or networks disable JavaScript. This does not matter, be-
    cause even when it is enabled, the design-around does not stop infringing the Scanlan patent. *In-*

25  *fra* at 20-22. And even if the design-around *did* avoid the Scanlan patent in cases when JavaS-
    cript is enabled, the Court did not enjoin "most" of MotionPoint's infringement, but all of its in-

26  fringement. Since its inception, the Federal Circuit "has not tolerated the notion that a little in-
    fringement—*de minimis* infringement—is acceptable infringement or not infringement at all.

27  The statute states directly that any unauthorized use of a patented invention is an infringement."
    *Embrex, Inc. v. Service Eng'g Corp.*, 216 F.3d 1343, 1352-53 (Fed. Cir. 2000) (Rader, J., con-

28  curring). Similarly, any infringement after January 12, 2015 is a violation of the injunction.

16

1   When visiting MotionPoint customer websites on a browser that is not using JavaScript,

2   it becomes abundantly clear that the MotionPoint technology continues to be based on the same

3   infringing systems and methods that were shown to the jury at trial. (Clark Decl., ¶¶ 130-42.)

4   Without JavaScript, the website at http://www.bestbuy.com/ (last visited Jan. 20, 2015) appears

5   as below. The message that because "JavaScript is disabled," a user may not be able to view the

6   "full content of BestBuy.com" is clear evidence that Best Buy too knows that some users do not

7   use JavaScript. (*Id.*, ¶ 131.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



23   (*Id.*)

24   A single action translation component, the "Español" link, still appears on the site at

25   http://www.bestbuy.com/, although it is now less prominent than at trial, located in small font at

26   the bottom of the page next to the Facebook and Twitter logos:

27

28

17

(*Id.*, ¶¶ 131-34.)  The single action translation component is displayed simultaneously with at least part of an electronic communication (the web page), comprising text and at least one hyperlink.  The single action translation component (the word "Español" itself) is identified as effecting a translation in a single action, which is indeed what happens when a user clicks the link.  As at trial, MotionPoint continues to satisfy element [a] of representative claim 17.  (*Id.*, ¶ 134.)

With JavaScript disabled, MotionPoint's system still uses a communication network, the Internet, satisfying element [b] of representative claim 17 as it was shown to do at trial.  (Clark Decl., ¶ 135.)  And when a user clicks on the single action translation component, the following Spanish translation of the English Best Buy web page immediately appears, served up by MotionPoint's translation manager, from http://espanol.bestbuy.com/ (last visited Jan. 20, 2015):

18



(*Id.*, ¶ 136.) This demonstration confirms that in response to the user clicking the single action translation component, MotionPoint's "TransMotion Server" obtains the translation and directs it to the user over the Internet from the address http://espanol.bestbuy.com/.  MotionPoint thus continues to satisfy elements [c] and [d] of representative claim 17, as it did at trial. (*Id.*, ¶¶ 136-38.) But with JavaScript disabled, no "intermediate" screens or "pop-ups" appear before the translation is displayed. (*Id.*, ¶ 137.)

The Spanish translation has hyperlinks to additional webpages.  When a user activates one of those links by clicking it, for example the "Tarj. de credito" (credit cards) link, Motion-Point's system provides a translation of this further electronic communication, by bringing about or retrieving an existing a translation, an example of implicit navigation.  This satisfies the final element [e] of representative claim 17, just as shown at trial. (Clark Decl., ¶ 139.)

This is precisely the *same* functionality that TransPerfect proved was infringing at trial, using the *same* customer's website, Best Buy's, to demonstrate the *same* type of infringement.

19

1   *See supra* at Section IV. (Clark Decl., ¶¶ 140-41; *compare* ¶¶ 131-42 (post-injunction evidence)

2   *with* ¶¶ 30-34 (trial evidence).) There are at most only minor, colorable differences between the

3   technology shown above and that shown to the jury at trial, and any differences are not important

4   to the functionalities found to infringe. (*Id.*, ¶¶ 140-41.) With every element of representative

5   claim 17 satisfied, MotionPoint continues to infringe. Using a browser that is not employing Ja-

6   vaScript reveals that MotionPoint is in plain violation of the prohibition on infringement, despite

7   any so-called design-around. There could not be clearer grounds for contempt.

8        Using a browser that has JavaScript enabled only confirms that MotionPoint's attempted

9   design-around makes no meaningful difference and infringes in all instances (irrespective of

10  whether any particular user enables or disables JavaScript). As Dr. Clark explains, with JavaS-

11  cript enabled, MotionPoint's attempted design-around triggers a "pop-up" or "overlay" after a

12  user clicks the "Español" link and before MotionPoint displays a clear and unobstructed transla-

13  tion of the website. (Clark Decl., ¶ 143.) With JavaScript enabled, the English site at

14  http://www.bestbuy.com/ still has the single action translation component—the word "Espa-

15  ñol"—next to the Facebook and Twitter logos at the bottom of the page. (*Id.*, ¶ 144.) It still con-

16  tinues to display the single action translation component simultaneously with at least part of the

17  web page, which comprises text and at least one hyperlink, and as before, it remains identified as

18  effecting a translation in "Español" in a single action (satisfying element [a] of claim 17). (*Id.*,

19  ¶ 145.) The system continues to use the Internet as its communication network, satisfying ele-

20  ment [b]. (*Id.*, ¶ 146.)

21       With JavaScript enabled, in response to the user clicking the single action translation

22  component, MotionPoint's "TransMotion Server" obtains the Spanish translation and directs it

23  over the Internet to the user from the address http://espanol.bestbuy.com, satisfying elements [c]

24  and [d] of claim 17. (*Id.*, ¶ 147.) However, with JavaScript enabled, the translation served up

25  from http://espanol.bestbuy.com is partially obscured and concealed by MotionPoint's JavaScript

26  "pop-up" and button in the center of the page ("Continuar en español? Español"), and by the

27  blurring or shading effect of the JavaScript code, as shown below:

28

20



(Clark Decl., ¶ 148.)

This JavaScript "pop-up"—MotionPoint's attempted design-around—obscures and obstructs the translation. (*Id.*) Nonetheless, clicking the single action translation component still obtains the translation, despite MotionPoint trying to conceal it behind JavaScript effects. (*Id.*, ¶¶ 149-50.) The "design-around" simply adds unclaimed features, like blurriness and obstruction of the translation. (*Id.*) But nothing in the claims of the Scanlan patent prohibits such a use of JavaScript, and nothing in the claims requires the system to immediately make the translation unshaded or unobscured; merely that it be delivered and obtained. (*Id.*) Notably, the JavaScript "overlay" does not eliminate or modify any functionality found to infringe the Scanlan patent, including the single action translation component. (*Id.*, ¶ 151-52.) That MotionPoint has chosen, now that the injunction is in effect, to try to *conceal* its infringement with blurring effects and overlays is a merely colorable change, not a significant one. (*Id.*, ¶ 152.) The Spanish translation can be viewed more clearly after the user clicks "Español" to remove MotionPoint's JavaScript "pop-up." (*Id.*, ¶ 154.) Once again, the implicit navigation features satisfying element [e] of

1   claim 17 are present and functional. (*Id.*, ¶ 155.) With all elements satisfied even *with* JavaScript

2   enabled, this is confirmation of MotionPoint's continuing infringement.

3          As Dr. Clark explains, the addition of JavaScript to create a "pop-up" is a trivial, conven-

4   tional application of programming skills that have been known for years. (*Id.*, ¶ 156.) From the

5   perspective of one skilled in the art, this "design-around" has no innovative significance, is obvi-

6   ous, and serves no real purpose other than to obscure the infringement. (*Id.*, ¶¶ 152-59.) This is

7   strong evidence that the "change" is not more than merely colorable. *TiVo*, 646 F.3d at 882-83.

8          This cosmetic change that appears to *add* a step before the user can view a translation

9   does not *eliminate* or modify the single action translation component. (*Id.*, ¶ 151-52.) Rather,

10  MotionPoint's use of JavaScript follows the teachings of the Scanlan patent. (*Id.,* ¶ 158.) Scanlan

11  describes multiple examples of how a single action translation component may be accessed after

12  taking other steps, such as selecting text, right-clicking a mouse, or expanding a "pull-down"

13  menu. (*Id.*; *see* Scanlan patent, Clark Decl., B, 5:38-50, Figs. 4-6.) The Scanlan patent even dis-

14  cusses using "JavaScript code" to "enable" the single action translation component as Motion-

15  Point is doing. (*Id.*, 5:45-50.) Using JavaScript as Scanlan describes, and adding steps to access

16  the single action translation component as Scanlan also describes, does not eliminate the single

17  action translation component or stop the infringement.

18         MotionPoint's addition of JavaScript code, which it never discussed with TransPerfect or

19  the Court until after the injunction went into effect, does not raise "a fair ground of doubt" over

20  whether MotionPoint continues to infringe, *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S.

21  609, 618 (1885), because it does not modify or eliminate "one or more of those elements previ-

22  ously found to infringe." *Tivo*, 646 F.3d at 882. Instead, MotionPoint merely *added* a trivial un-

23  claimed feature, which can be disabled to expose the infringing systems and methods. Motion-

24  Point's technology, even as implemented with its attempted "design-around," reflects at best a

25  merely colorable change that does not avoid infringement.

26  **V.   MOTIONPOINT SHOULD BE HELD IN CONTEMPT AND TRANSPERFECT
         FAIRLY COMPENSATED.**

27

28         Nothing TransPerfect, the jury, and two federal courts have done so far has deterred Mo-

22

1  tionPoint from continuing to unlawfully infringe TransPerfect's patent. The Court should now

2  exercise its authority "to coerce the defendant into compliance with the court's order, and to

3  compensate the complainant for losses sustained." *Whittaker Corp. v. Execuair Corp.*, 953 F.2d

4  510, 517 (9th Cir. 1992) (citation omitted). The Court has "broad equitable power" to do so. *FTC*

5  *v. EDebitPay, LLC*, 695 F.3d 938, 945 (9th Cir. 2012) (quotation omitted).

6      ***First***, the Court should issue an order holding MotionPoint in contempt for failing to

7  comply with the injunction and continuing to infringe TransPerfect's patent by making, using,

8  and selling infringing technology on and after January 12, 2015.

9      ***Second,*** the Court now should order MotionPoint to give written notice of the injunction

10  to all of its customers. As the Court earlier warned, "[i]f MotionPoint is later found in contempt,

11  *the Court will order notice to its customers*." (Dkt. 544 at 16.)

12      ***Third***, the Court should order that in any further attempts to redesign its technology to

13  avoid the Scanlan patent, MotionPoint shall not rely on JavaScript or any other optional technol-

14  ogy that can be disabled by a user, and instead shall implement permanent changes designed to

15  ensure no further infringement. An optional design-around is no design-around at all.

16      ***Fourth***, MotionPoint should not be allowed to profit from violating the injunction. The

17  four percent royalty awarded by the jury gave MotionPoint no motivation to stop infringing,[4] and

18  the Court has recognized that a royalty is an inadequate remedy at law. (Dkt. 544 at 15.) There-

19  fore, the Court should order an accounting and disgorgement of MotionPoint's gross profits on

20  all infringing sales made starting January 12, 2015 until the date that MotionPoint stops all of its

21  infringement and has certified to the Court, with satisfactory evidence, that it has done so. The

22  accounting, in addition to calculating the ill-gotten profits, should include sufficient technical

23  information to show, for each customer and for each implementation of MotionPoint's technolo-

24  gy, what form of "design-around" (if any) MotionPoint has implemented, and when, to permit

25  TransPerfect to verify that the infringement finally has ceased.

26

27  [4] This is not surprising, as MotionPoint's damages expert explained at trial that its profits are
    nearly ten times higher than four percent of revenues. (Trial Tr. at 1489-91; Gross Decl. Exh. K

28  (MotionPoint's DDX-2021.22).)

1    Ordering disgorgement of profits is within the Court's authority and is the only way to

2    ensure that MotionPoint will not benefit from violating the Court's order. *Leman v. Krentler-*

3    *Arnold Hinge Last Co.*, 284 U.S. 448, 456-57 (1932). It is particularly appropriate here, where no

4    prior remedies have deterred continuing infringement. *See, e.g.*, *Brine, Inc. v. STX L.L.C.*, 367 F.

5    Supp. 2d 61, 71 (D. Mass. 2005). MotionPoint elected to "build a business on a product found to

6    infringe" and cannot now complain that complying with the injunction will eliminate its profits.

7    *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1306 (Fed. Cir. 2012).

8    The decision in *ePlus Inc. v. Lawson Software, Inc.* involved similar facts. 946 F. Supp.

9    2d 472, 495-96 (E.D. Va. 2013), *vacated on other grounds*, 760 F.3d 1350 (Fed. Cir. 2014).

10   ePlus obtained a verdict that two of its patents were infringed, and the court enjoined Lawson

11   from further infringement. *Id.* at 475. While Lawson was appealing the district court's decision,

12   it supposedly began efforts to design around the patent. *Id.* at 476. But Lawson did not present

13   the product to the Court before releasing it to the public, and had made various representations

14   that the newly accused product had 100% of the same functionality as the old. *Id.* at 477, 487.

15   The new product was only cosmetically different from the old product. *Id.* at 487, n.14. The

16   court found it was not more than colorably different, that it infringed, and held Lawson in con-

17   tempt. *Id.* at 488-92. It ordered the disgorgement of profits, because "awarding a reasonable roy-

18   alty would simply encourage continued defiance of court orders," and because the "defendant's

19   profits from wrongdoing are so much greater than any estimated royalty amount." *Id.* at 495. For

20   all the same reasons, disgorgement of profits is the appropriate remedy here.[5]

21   ***Fifth***, the Court should award TransPerfect its costs and attorneys' fees incurred in con-

22   nection with these proceedings. *See e.g.*, *Sunearth, Inc. v. Sun Earth Solar Power Co., Ltd.*, No.

23   ――――――――――――――――――――

24   [5] At a bare minimum, the Court should award TransPerfect an upwardly adjusted royalty of at
     least eight percent of all infringing revenue after the injunction went into effect, given the
     changed circumstances between today and 2005, when the infringement began. TransPerfect ex-

25   plained the factual and legal basis for such a royalty under *Amado v. Microsoft Corp.*, 517 F.3d
     1353, 1361-62 (Fed. Cir. 2008) in earlier briefing, which it incorporates herein by reference.

26   (Dkt. 542.) The Court has authority to award a reasonable royalty in this situation. *See, e.g.*,
     *Hubbard/Downing, Inc. v. Kevin Heath Enters.*, No. 1:10-cv-1131-WSD, 2014 U.S. Dist. LEXIS

27   764, *25-30 (N.D. Ga. Jan. 6, 2014). However, such an award would unfairly leave MotionPoint
     with a considerable profit. The fairer remedy, which may have the needed deterrent effect, is dis-

28   gorgement of profits.

1   C 11-4991 CW, 2013 U.S. Dist. LEXIS 120409, *9-10 (N.D. Cal. Aug. 23, 2013) (Wilken, C.J.);

2   *Levi Strauss & Co. v. Papikian Enters.*, No. C 10-05051 JSW, 2012 U.S. Dist. LEXIS 112938,

3   *1-9 (N.D. Cal. Aug. 10, 2012). The Federal Circuit has affirmed awarding attorneys' fees in-

4   curred in contempt proceedings. *See Stryker Corp. v. Davol Inc.*, 234 F.3d 1252, 1260 (Fed. Cir.

5   2000). Other courts are in accord. *See Brine*, 367 F. Supp. 2d at 70-71; *Hubbard/Downing*, 2014

6   U.S. Dist. LEXIS 764 at *31-32. MotionPoint, the violator of the injunction, should bear the cost

7   of ensuring its compliance, not TransPerfect.

8        MotionPoint's willful disregard of the Court's order also supports an award of attorneys'

9   fees. *See In re TFT-LCD Flat Panel Antitrust Litig.*, 289 F.R.D. 548, 554 (N.D. Cal. 2013); *As-*

10  *soc'd Gen. Contractors v. S.F. Unified School Dist.*, 544 F. Supp. 845, 847-848 (N.D. Cal.

11  1982); *Upjohn Co. v. Medtron Labs., Inc.*, 894 F. Supp. 126, 136 (S.D.N.Y. 1995); *Bose Corp. v.*

12  *Linear Design Labs, Inc.*, No. 71 Civ. 3103, 1978 U.S. Dist. LEXIS 16195, *1-3 (S.D.N.Y. Mar.

13  1, 1978) (awarding fees where the defendants "scrupulously avoided the obvious course of seek-

14  ing plaintiff's approval for their course of conduct and of informing the Court that they intended

15  to embark on that course of conduct."). But even if MotionPoint's conduct were not deliberate,

16  the law is clear that a finding of willfulness is *not* a prerequisite to an award of attorneys' fees in

17  civil contempt actions. *See Perry v. O'Donnell*, 759 F.2d 702, 704 (9th Cir. 1985). Earlier in this

18  case, the Court found that "most" of MotionPoint's litigation conduct did not justify an award of

19  attorneys' fees, but admonished MotionPoint because it "has asserted some frivolous arguments

20  and filed some frivolous motions during this litigation." (Dkt. 544 at 18-19.) MotionPoint's re-

21  peated violation of the injunction goes beyond frivolous. It is contemptuous. It justifies a full

22  award of attorneys' fees and expenses in connection with enforcing the Court's injunction.

23  **VI.    CONCLUSION**

24       For the foregoing reasons, the Court should hold MotionPoint in contempt for violating

25  the permanent injunction and award TransPerfect the relief requested herein and all further relief

26  the Court deems just and appropriate.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: February 3, 2015

Respectfully submitted,

LATHAM & WATKINS LLP

By  */s/ Gabriel S. Gross*
      Douglas E. Lumish
      Jeffrey G. Homrig
      Gabriel S. Gross
      Nikolaus A. Woloszczuk
      Joseph H. Lee

      Attorneys for Plaintiffs/Counterclaim Defend-
      ants TransPerfect Global, Inc.; TransPerfect
      Translations International, Inc.; and Transla-
      tions.com, Inc.

SV\1460581.1

26